# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 13, 2021

Lyle W. Cayce
Clerk

No. 19-10396

Michelle Cochran,

*Plaintiff—Appellant*,

*versus*

U.S. Securities and Exchange Commission; Gary Gensler, *in his official capacity as Chairman of the U.S. Securities and Exchange Commission*; Merrick Garland, *U.S. Attorney General*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:19-CV-66

Before Owen, *Chief Judge*, and Jones, Smith, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Costa, Willett, Duncan, Engelhardt, Oldham, and Wilson, *Circuit Judges*.[1]

---

[1] Judge Ho is recused and did not participate in this decision.

No. 19-10396

HAYNES, *Circuit Judge*, joined by JONES, SMITH, ELROD, WILLETT,[2] DUNCAN, ENGELHARDT, OLDHAM, and WILSON, *Circuit Judges*:

The question presented is whether a provision of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78y, implicitly strips federal district courts of subject-matter jurisdiction to hear structural constitutional claims. The district court held yes, and a panel of our court affirmed. Rehearing the case en banc, we determine that the Exchange Act does not disturb the district court's jurisdiction over such claims.

Therefore, as explained below, we AFFIRM the district court's judgment in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

## I.    Background

In April 2016, the Securities and Exchange Commission ("SEC") brought an enforcement action against Michelle Cochran, a certified public accountant. The SEC alleged that Cochran violated the Exchange Act by, *inter alia*, failing to comply with auditing standards issued by the Public Company Accounting Oversight Board ("PCAOB") when performing quarterly reviews and annual audits between 2010 and 2013. After a hearing, an SEC administrative law judge ("ALJ") ruled against Cochran, imposing a $22,500 penalty and a five-year ban on practicing before the SEC. The SEC adopted the ALJ's decision. Cochran objected.

Before the SEC ruled on Cochran's objection, the Supreme Court intervened. In *Lucia v. SEC*, the Court held that SEC ALJs are officers of the

---

[2] JUDGE WILLETT concurs in the judgment because he believes this case is controlled by *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 489 (2010) ("[T]he text [of § 78y] does not expressly limit the jurisdiction that other statutes confer on district courts. *See, e.g.*, 28 U.S.C. §§ 1331, 2201.").

United States under the Appointments Clause, who must be appointed by the President, a court of law, or a department head. 138 S. Ct. 2044, 2049, 2051 & n.3 (2018). Because the ALJ who had issued the initial decision in *Lucia* had not been appointed by a person or entity in one of those three categories (but had instead been appointed by SEC staff members), the Court remanded the case to the SEC for further proceedings before a constitutionally appointed ALJ. *Id.* at 2050, 2055.

In response to *Lucia*, the SEC remanded all pending administrative cases for new proceedings before constitutionally appointed ALJs.[3] Cochran's case was reassigned to a new ALJ.

Cochran filed suit in federal district court to enjoin the SEC's administrative enforcement proceedings against her. Though the SEC had fixed the appointment problem *Lucia* addressed, Cochran contended it did not fix a removability problem *Lucia* declined to reach: she alleged that, because SEC ALJs enjoy multiple layers of "for-cause" removal protection, they are unconstitutionally insulated from the President's Article II removal power. Cochran also asserted that the SEC violated her due process rights by failing to adhere to its own rules and procedures.

The district court dismissed Cochran's case for lack of subject-matter jurisdiction, reasoning that because § 78y permits judicial review of final SEC orders in the courts of appeals, the Exchange Act implicitly strips district courts of jurisdiction to hear challenges to ongoing SEC enforcement proceedings. In the district court's view, Cochran was required to raise her constitutional claims in the ALJ proceeding and then petition for review in the Fifth Circuit or the District of Columbia Circuit if she was dissatisfied

---

[3] The SEC had previously cured the constitutional defect identified in *Lucia* by ratifying the appointment of all of its ALJs.

with the outcome.  Cochran timely appealed, and we enjoined the SEC administrative proceedings pending appeal.

Subsequently, a panel of this court affirmed the district court's dismissal of Cochran's claims for lack of jurisdiction.  *Cochran v. SEC*, 969 F.3d 507, 511–18 (5th Cir. 2020).  Although there was no disagreement on the ultimate decision to affirm as to Cochran's due process claim, the panel reached a 2-1 decision affirming on the removal power claim.  *See id.* at 518 & n.1 (Haynes, J., dissenting in part).  We then granted rehearing en banc. *Cochran v. SEC*, 978 F.3d 975 (5th Cir. 2020) (mem.).

## II.    Jurisdiction and Standard of Review

The sole issue on appeal is whether the district court had subject-matter jurisdiction over Cochran's claims.[4]  Nevertheless, the district court undoubtedly had "jurisdiction to determine its own jurisdiction."  *United States v. Ruiz*, 536 U.S. 622, 628 (2002).  We have appellate jurisdiction under 28 U.S.C. § 1291.  We review de novo a district court's dismissal for lack of subject-matter jurisdiction.  *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 666 F.3d 336, 338 (5th Cir. 2011).

---

[4] In her en banc briefing, Cochran does not argue that the district court erred by dismissing her due process claim.  At oral argument, however, Cochran's counsel insisted that Cochran had not abandoned that claim.  It is well established that a litigant cannot resuscitate an abandoned claim by raising it at oral argument.  *See United States v. Menesses*, 962 F.2d 420, 425–26 (5th Cir. 1992) (holding that a litigant waived an argument by failing to brief the issue, instead raising it for the first time at oral argument).  Accordingly, we conclude that Cochran has abandoned her due process claim and therefore affirm the district court's dismissal of it.  *See Coke v. Gen. Adjustment Bureau*, 640 F.2d 584, 586 n.2 (5th Cir. Mar. 1981) (en banc) ("[The party] has not renewed this argument in his briefs to the en banc court, and we therefore consider the argument to have been abandoned.");  *Justiss Oil Co. v. Kerr-McGee Refin. Corp.*, 75 F.3d 1057, 1067 (5th Cir. 1996) (explaining that "[w]hen an appellant fails to advance arguments in the body of its brief in support of an issue it has raised on appeal, we consider such issues abandoned").

No. 19-10396

## III.    Discussion

The SEC presents two bases for affirming the district court.  First, the SEC argues that Congress implicitly stripped district courts of jurisdiction to hear structural constitutional claims under § 78y.  Second, the SEC argues that Cochran's claims are not yet ripe.  We discuss and reject each argument in turn.

### A.    Implicit Jurisdiction Stripping

We first consider the text of § 78y.  We conclude that it did not explicitly or implicitly strip the district court of jurisdiction over Cochran's claim.  We next consider Supreme Court precedent.  The Supreme Court has already rejected the SEC's *precise* jurisdictional argument under § 78y, so we do the same.  Finally, we independently consider the so-called "*Thunder Basin* factors."  We conclude those factors do not warrant departing from the statutory text or deviating from the Supreme Court's interpretation of § 78y.

#### 1.    Statutory Text

Congress gave federal district courts jurisdiction over "*all* civil actions arising under the Constitution."  28 U.S.C. § 1331 (emphasis added).  Not some or most—but all.  It is undisputed that Cochran's removal power claim arises under the Constitution.  Moreover, the Supreme Court has repeatedly told us that "when a federal court has jurisdiction, it also has a 'virtually unflagging obligation . . . to exercise that authority.'"  *Mata v. Lynch*, 576 U.S. 143, 150 (2015) (ellipsis in original) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)); *see, e.g.*, *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) ("We have often acknowledged that federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress.").

No. 19-10396

It is true, however, that Congress can limit district court jurisdiction if it so chooses. *See Sheldon v. Sill*, 49 U.S. 441, 449 (1850) (confirming congressional control over lower federal court jurisdiction). The SEC argues that Congress chose to limit district court jurisdiction by enacting § 78y. That section provides, in relevant part:

> A person aggrieved by a final order of the Commission entered pursuant to this chapter may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit, by filing in such court, within sixty days after the entry of the order, a written petition requesting that the order be modified or set aside in whole or in part.

15 U.S.C. § 78y(a)(1). By giving *some* jurisdiction to the courts of appeals, the SEC argues, Congress implicitly stripped *all* jurisdiction from every other court—including district courts' jurisdiction over removal power claims under § 1331.

In assessing the merits of this argument, "[w]e start, of course, with the statutory text." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). *See generally Salinas v. U.S. R.R. Ret. Bd.*, 141 S. Ct. 691, 698 (2021) (noting that there is a "strong presumption favoring judicial review of administrative action" that the Government may rebut only by carrying the "'heavy burden' of showing that the statute's 'language or structure' forecloses judicial review" (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015))). The text of § 78y conflicts with the SEC's position in three ways.

First, § 78y provides that *only* "person[s] aggrieved by a final order of the Commission" may petition in the relevant court of appeals to review that final order. The statute says nothing about people, like Cochran, who have not yet received a final order of the Commission. Nor does it say anything about people, again like Cochran, who have claims that have nothing to do

6

with any final order that the Commission might one day issue. Cochran's removal power claim challenges the *constitution* of the tribunal, not the legality or illegality of its final order. Her injury has absolutely nothing whatsoever to do with a final order, and therefore her claim falls outside of § 78y.[5]

Second, § 78y(a)(1) is phrased in permissive terms. It says a person aggrieved by a final order "may" petition for review in the court of appeals. But it does not say that anyone "shall" or "shall not" do anything. It would be troublingly counterintuitive to interpret § 78y(a)(1)'s permissive language as eliminating alternative routes to federal court review, especially in the context of separation-of-powers claims of the sort at issue here. *See Burton*, 549 U.S. at 91 ("[S]tatutory terms are generally interpreted in accordance with their ordinary meaning."); *cf. Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021) (explaining that, generally, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge" in federal court because "the separation of powers is designed to preserve the liberty of all the people").

Third, § 78y elsewhere uses mandatory terms—and they confirm our understanding that Congress did not strip district courts of § 1331

---

[5] Here's a different way of saying the same thing. Imagine two different SEC investigation targets, Jane and Sue. Jane thinks the SEC is investigating her unfairly and that she's innocent. Implicit jurisdiction stripping helps the SEC avoid judicial review of Jane's claims until after the completion of its enforcement proceeding and the issuance of a final order. The SEC could argue, by giving Jane the right to challenge a final order in § 78y, Congress *implicitly stripped* Jane's right to pre-enforcement review before the issuance of a final order. But what about Sue? Sue is aggrieved by the fact that her ALJ is unconstitutionally appointed. Section 78y cannot strip jurisdiction over Sue's claims because Sue is completely outside the statute from the word go. The only way for the SEC to avoid judicial review of Sue's claims is to say that Congress implicitly stripped review of Jane's claims and that implicitly also stripped review of Sue's. It's implicit stripping *squared*.

jurisdiction over structural constitutional claims. Under § 78y(a)(3), jurisdiction "becomes exclusive" in the court of appeals only after (1) the SEC issues a final order, (2) an aggrieved party files a petition, and (3) the SEC submits its administrative record. The use of the word "exclusive" in § 78y(a)(3) shows that Congress knew how to strip jurisdiction when it wanted to—and it only highlights that Congress did not strip § 1331 jurisdiction elsewhere.[6] *Cf. Vaden v. Discover Bank*, 556 U.S. 49, 59 n.9 (2009) ("[W]hen Congress wants to expand [federal-court] jurisdiction, it knows how to do so clearly and unequivocally." (second alteration in original) (citation omitted)). The SEC's contrary position would effectively write § 78y(a)(3) out of the statute—there would be no point in making jurisdiction "exclusive" in the court of appeals if no other court ever had jurisdiction. We are loath to reach such a result. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (noting that courts are "'reluctan[t] to treat statutory terms as surplusage' in any setting" (alteration in original) (quoting *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 698 (1995))). Consequently, the text of § 78y does not support the SEC's position with respect to Cochran's removal power claim.[7]

---

[6] Similarly, the statute's use of the linking verb "become" adds a temporal element, telling us that the subject ("jurisdiction") is only linked to the complement ("exclusive") *after* a petition is filed. In contrast, for example, the statute could have said that jurisdiction "is exclusive," or that the court of appeals "has exclusive jurisdiction." *See, e.g.*, 15 U.S.C. § 717r(d)(1) (providing that "[t]he United States Court of Appeals . . . shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency"). But the use of "becomes" necessarily implies a transformation.

[7] Our holding is limited to the specific removal power claim at issue here; as this is not a "mine-run" securities law case, we do not consider the question of whether the text of the Exchange Act evinces an intent to strip district courts of jurisdiction over claims that actually relate to a final SEC order.

No. 19-10396

### 2.    *Free Enterprise Fund*

Any doubts we might have were put to rest by the Supreme Court's decision in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010). In *Free Enterprise Fund*, the Supreme Court rejected the precise argument the SEC makes here—that the Exchange Act divests district courts of jurisdiction over removal power challenges. *See id.* at 489. Hence, *Free Enterprise Fund* is squarely on point, foreclosing any possibility that § 78y strips district courts of jurisdiction over structural constitutional challenges.

In *Free Enterprise Fund*, the PCAOB inspected an accounting firm, issued a report criticizing its auditing practices, and opened a formal investigation. *Id.* at 487. The accounting firm (and a nonprofit organization it belonged to) then filed suit in federal district court, seeking a declaratory judgment that the PCAOB was unconstitutionally structured, as well as an injunction preventing the PCAOB from exercising its powers. *Id.* The accounting firm argued that the PCAOB's double for-cause removal protection violated the President's Article II removal power. *Id.* It also asserted that the members of the PCAOB had not been properly appointed under the Appointments Clause. *Id.* at 487–88. Just as it does now, the Government maintained that § 78y deprived the district court of jurisdiction to hear the accounting firm's constitutional challenges.[8] *Id.* at 489.

The Supreme Court rejected the Government's argument and held "the text [of § 78y] does not expressly limit [district court] jurisdiction . . . . Nor does it do so implicitly." *Id.* In reaching that result, the

---

[8] According to the Government, § 78y was relevant in *Free Enterprise Fund* because the SEC had the power "to review any [PCAOB] rule or sanction"; thus, § 78y permitted review of PCAOB actions that were ratified as final SEC orders. 561 U.S. at 489.

Court explained that "we presume that Congress does not intend to limit jurisdiction if [1] 'a finding of preclusion could foreclose all meaningful judicial review'; [2] if the suit is 'wholly collateral to a statute's review provisions'; and [3] if the claims are 'outside the agency's expertise.'" *Id.* (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994) (laying out these considerations, referred to as the "*Thunder Basin* factors")).

First, the Court determined that the Government's theory would foreclose all meaningful judicial review because "[s]ection 78y provides only for judicial review of [SEC] action, and not every [PCAOB] action is encapsulated in a final [SEC] order or rule." *Id.* at 490. The Court explained that the PCAOB's investigation of the accounting firm had not led to any sanction and that the PCAOB's critical inspection report was not subject to judicial review. *Id.*

Second, the Court determined that the accounting firm's challenge was "collateral" to § 78y's review provisions because it "object[ed] to the [PCAOB]'s existence, not to any of its auditing standards." *Id.* Thus, the Court rejected the Government's suggestion that the accounting firm could have sought SEC review of a PCAOB rule or regulation, as such a challenge would have been a pointless pretext for its structural constitutional claims. *Id.* (noting that "[r]equiring petitioners to select and challenge a [PCAOB] rule at random [would be] an odd procedure for Congress to choose").

Finally, the Court held that the accounting firm's constitutional claims were outside the SEC's expertise because they were "standard questions of administrative law" that did not require any "fact-bound inquiries" or "'technical considerations of [agency] policy.'" *Id.* at 491 (alteration in original) (quoting *Johnson v. Robinson*, 415 U.S. 361, 373 (1974)). Consequently, the Court concluded that § 78y did not deprive the district court of jurisdiction over the accounting firm's constitutional claims. *Id.*

No. 19-10396

Just like *Free Enterprise Fund*, this case concerns the question of whether the Exchange Act divests district courts of jurisdiction to consider removal power challenges; every material aspect of the Supreme Court's reasoning in *Free Enterprise Fund* would seem to apply with equal force here. Nevertheless, the SEC urges us to depart from *Free Enterprise Fund*, even though that case involved the same statutory-review scheme and the same type of constitutional claim.

The SEC primarily argues that *Free Enterprise Fund* is distinguishable because, in that case, the PCAOB had not yet commenced an administrative proceeding against the plaintiff accounting firm. Since Cochran is already in the midst of an administrative proceeding, and that proceeding could eventually result in a final SEC order that Cochran may challenge under § 78y, the SEC contends that she has a meaningful opportunity for judicial review. Yet, this difference lacks meaning: although Cochran's case is farther along than in *Free Enterprise Fund*, she is still not guaranteed an adverse final order, as the SEC might resolve her case in her favor. Hence, just as in *Free Enterprise Fund*, it remains possible that Cochran will not be able to obtain judicial review over her removal power claim unless the district court hears it now. In short, *Free Enterprise Fund* still controls.[9]

---

[9] The dissenting opinion attempts to salvage the SEC's "enforcement-investigation distinction" on the basis that permitting district court jurisdiction over challenges to pending enforcement proceedings would disrupt the statutory scheme. *See* Dissenting Op. at 88 n.15. Of course, given the Supreme Court's decision in *Free Enterprise Fund*, the dissenting opinion is forced to concede that district court jurisdiction over challenges to SEC investigations does not disrupt the statutory scheme. *Id.* Yet, the dissenting opinion fails to point to anything in the text of the Exchange Act or in *Free Enterprise Fund* that distinguishes between investigation and enforcement. Consequently, we see no basis for supposing that permitting judicial review over ongoing SEC enforcement proceedings would be more disruptive than judicial review over SEC investigations.

No. 19-10396

Nevertheless, the SEC asserts that other circuits have adopted its view of *Free Enterprise Fund* and held that the Exchange Act strips district courts of jurisdiction over structural constitutional claims.[10]  But the other circuits are not as unanimous as they appear, as their decisions have drawn powerful dissents that largely support our position.  *See Tilton v. SEC*, 824 F.3d 276, 292 (2d Cir. 2016) (Droney, J., dissenting) ("I conclude that *Free*

---

[10] *See Tilton v. SEC*, 824 F.3d 276, 281–91 (2d Cir. 2016) (concluding that the Exchange Act precluded district court jurisdiction over an Appointments Clause challenge to an ongoing SEC proceeding); *Bennett v. SEC*, 844 F.3d 174, 186 (4th Cir. 2016) (concluding that § 78y precluded district court jurisdiction over a removal power claim and reasoning that *Free Enterprise Fund* did not control because the plaintiff was "already embroiled in an enforcement proceeding"); *Bebo v. SEC*, 799 F.3d 765, 774–75 (7th Cir. 2015) (same); *Hill v. SEC*, 825 F.3d 1236, 1248, 1252 (11th Cir. 2016) (same); *Jarkesy v. SEC*, 803 F.3d 9, 20, 30 (D.C. Cir. 2015) (holding that § 78y precluded district court jurisdiction over various constitutional claims, including a nondelegation doctrine claim, and determining that *Free Enterprise Fund* did not control because the plaintiff was "already properly before the [SEC] by virtue of his alleged violations of [the securities] laws"); *see also Axon Enter., Inc. v. FTC*, 986 F.3d 1173, 1182–83 (9th Cir. 2021) (holding that the district court lacked jurisdiction to hear a pre-enforcement removal power challenge regarding Federal Trade Commission ALJs and embracing the reasoning of *Tilton, Bennett, Bebo, Hill*, and *Jarkesy*).

We note that several of the other circuits relied on their own precedents in concluding that the plaintiffs' claims were precluded.  *See Tilton*, 824 F.3d at 285; *Hill*, 825 F.3d at 1248; *Jarkesy*, 803 F.3d at 19, 22, 24, 26, 29–30.  It is likely that these courts were required to follow their own prior decisions.  *See Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 199 (2d Cir. 2017) (per curiam) (explaining that the court is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court" (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004))); *In re Burgest*, 829 F.3d 1285, 1287 (11th Cir. 2016) (per curiam) (same); *United States v. Eshetu*, 898 F.3d 36, 37 (D.C. Cir. 2018) (per curiam) (noting that "one panel cannot overrule another").  By contrast, an en banc decision allows us to consider again any prior precedents, although we do not have any that require a different outcome here, as we explain.  *See United States v. Anderson*, 885 F.2d 1248, 1255 (5th Cir. 1989) (en banc) (noting that, when sitting en banc, we do not "hesitate[]" to overrule incorrect panel decisions).  Thus, we are free to focus exclusively on the Supreme Court's precedents; based on those precedents, we are bound to rule in Cochran's favor, despite our reluctance to disagree with our fellow circuits.

*Enterprise* controls here."); *Axon Enter., Inc. v. FTC*, 986 F.3d 1173, 1196 (9th Cir. 2021) (Bumatay, J., concurring in part and dissenting in part) (addressing a different statute and concluding, based on *Free Enterprise Fund*, "that all three *Thunder Basin* factors—meaningful review, wholly collateral, and agency expertise—favor[ed] district court jurisdiction" over the plaintiff's removal power claim). Moreover, the consensus view is not always correct. *See, e.g.*, *Rehaif v. United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting) (noting that *Rehaif* rejected an interpretation of the relevant statute that had "been adopted by every single Court of Appeals to address the question"). So the SEC's tallying of the circuits does not change our conclusion.

The SEC also relies on *Bank of Louisiana v. FDIC*, where we discussed the "ongoing proceeding" distinction in holding that the district court lacked jurisdiction over a separation-of-powers challenge to an administrative proceeding before the Federal Deposit Insurance Corporation ("FDIC"). 919 F.3d 916, 925–27, 930 (5th Cir. 2019). Critically, the statutory-review scheme at issue in that case differed in a key respect from the Exchange Act's: in *Bank of Louisiana*, the scheme included an explicit statutory bar on any court enjoining "the issuance or enforcement of any . . . [FDIC] order." *Id.* at 920 (quoting 12 U.S.C. § 1818(i)(1)). Accordingly, we held that district court jurisdiction was *explicitly* divested. *Id.* at 924 (explaining that "the plain terms of section 1818(i) bar jurisdiction here"). Although we proceeded to analyze the *Thunder Basin* factors, we did so merely to "reinforce" our conclusion based on the explicit jurisdictional bar. *Id.* at 925. Consequently, we clarify that *Bank of Louisiana* was addressing the explicit statute at issue there—not all statutes that may be questioned—and it does not mandate the outcome here. Thus, the SEC's effort to rely on *Bank of Louisiana* is unconvincing.

No. 19-10396

### 3.    The Supreme Court's Other Precedents

As stated above, *Free Enterprise Fund* is enough to decide this case. However, because the SEC contends otherwise, we will proceed by assuming arguendo that we cannot rely exclusively on *Free Enterprise Fund* and conduct a further analysis using the so-called "*Thunder Basin* factors." Before doing so, it is necessary to review the Supreme Court's two other major precedents on implicit jurisdiction stripping, *Thunder Basin* itself and *Elgin v. Department of Treasury*, 567 U.S. 1 (2012).

### i.    *Thunder Basin*

In *Thunder Basin*, the Supreme Court set forth the framework now used to determine whether Congress implicitly precluded initial judicial review by creating a statutory framework that delegates initial review to an administrative agency. *See* 510 U.S. at 207. First, the Court considered whether Congress's intent to preclude district court jurisdiction was "fairly discernible in the statutory scheme." *Id.* (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)). Then, it addressed whether the claims at issue could "be afforded meaningful review" if the agency considered the claims first. *Id.* To determine whether a claimant would receive meaningful judicial review, the Court considered three factors: (1) whether "a finding of preclusion could foreclose all meaningful judicial review"; (2) whether the claims were "'wholly "collateral"' to a statute's review provisions"; and (3) whether the claims were "outside the agency's expertise." *Id.* at 212–13 (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)).

Then the Court applied that framework to the Federal Mine Safety and Health Amendments Act of 1977 (the "Mine Act"), 30 U.S.C. §§ 811–26. Like the Exchange Act, the Mine Act provides a detailed statutory scheme for review of administrative orders. In particular, mine operators are able to challenge adverse orders before the Federal Mine Safety and Health

14

Review Commission (the "Mine Commission"). *Thunder Basin*, 510 U.S. at 207 (citing 30 U.S.C. § 815(a) and (d)). Such challenges are heard before an ALJ. *Id.* at 207–08. The Mine Commission may review the ALJ's decision or simply permit it to become the Commission's final order. *Id.* at 208 n.9. Aggrieved persons may appeal adverse Mine Commission decisions to a court of appeals. *Id.* at 208 (citing 30 U.S.C. § 816(a)(1)–(2)). Like the SEC in this case, the Department of Labor argued that the Mine Act's review scheme prevented district courts from exercising subject-matter jurisdiction over pre-final decision challenges to the Mine Act. *Id.* at 202.

The Supreme Court held that the Mine Act's detailed statutory scheme evidenced Congress's intent to preclude district court jurisdiction over pre-enforcement challenges. *Id.* at 207–10. Further, the Court determined that the Mine Commission had exclusive original jurisdiction over claims like the plaintiff mine operator's National Labor Relations Act ("NLRA") and due process claims. *Id.* at 216. Although the Mine Commission had no particular experience with the NLRA, the mine operator's claims were ultimately about interpretation of the Mine Act's posting requirement. *Id.* at 214–15. That is, the mine operator's NLRA challenge was not "wholly collateral" to the provisions of the Mine Act and was actually "squarely within the Commission's expertise." *Id.* at 212, 214. Further, even if the operator's constitutional claim was "beyond" the Mine Commission's jurisdiction, the operator's "statutory and constitutional claims . . . [could] be meaningfully addressed in the Court of Appeals." *Id.* at 215 (citation omitted).

Finally, the Court held that the mine operator had a meaningful opportunity for judicial review of its claims. *Id.* at 216–18. The Court determined that compliance with the posting requirement would not be overly burdensome for the mine operator because the operator's fear that its NLRA rights would be violated was "speculative" and any such violation

could be separately remedied. *Id.* Further, despite the fact that the Mine Act's penalties were "onerous," the Court concluded that they did not have the "practical effect" of "foreclos[ing] all access to the courts" because they would not become "final and payable" until after appellate review. *Id.* at 218. Thus, the mine operator did not face "a constitutionally intolerable choice." *Id.* Consequently, the Court held that the Mine Act was intended to preclude district court review of the mine operator's claims and that those claims could be meaningfully reviewed. *Id.*

### ii. *Elgin*

Decided two years after *Free Enterprise Fund*, *Elgin* is the Supreme Court's most recent application of the *Thunder Basin* factors. Although the case further illustrated the framework, it did not break new ground.

In *Elgin*, the Supreme Court considered whether the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111, "provides the exclusive avenue to judicial review when a qualifying employee challenges an adverse employment action by arguing that a federal statute is unconstitutional." 567 U.S. at 5. Just as it did in *Free Enterprise Fund*, the *Elgin* Court applied the *Thunder Basin* factors.

First, the *Elgin* Court held that the CSRA's "elaborate" statutory-review scheme evidenced Congress's intent to foreclose district court jurisdiction. *Id.* at 10–13. Next, the Court rejected the plaintiff-employees' argument that the *Thunder Basin* factors indicated that their claims were not the type Congress intended to be reviewed through the CSRA. *Id.* at 15–16. The Court concluded that the CSRA offered the plaintiffs meaningful review of their claims because the Federal Circuit was "fully competent to adjudicate [those] claims" on appeal. *Id.* at 17. Then the Court held that the plaintiffs' claims were not "wholly collateral" to the CSRA's statutory-review scheme because these claims were "the vehicle by which [plaintiffs]

seek to reverse the removal decisions," and the CSRA scheme was designed to process removal challenges. *Id.* at 21–22. Finally, the Court determined that the Merit Systems Protection Board ("MSPB")'s expertise was still relevant because there were many "preliminary questions unique to the employment context [that could] obviate the need to address the constitutional challenge." *Id.* at 22–23. Consequently, the Court ruled that "the CSRA review scheme was intended to preclude district court jurisdiction over [the employees'] claims." *Id.* at 23.

### iii.  Application of the *Thunder Basin* Factors

We follow *Free Enterprise Fund* in breaking the *Thunder Basin* analysis down into two steps: first, whether a "'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction," and second, whether "the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 207, 212). At step two, "we presume that Congress does not intend to limit jurisdiction if [1] 'a finding of preclusion could foreclose all meaningful judicial review'; [2] if the suit is 'wholly collateral to a statute's review provisions'; and [3] if the claims are 'outside the agency's expertise.'"[11] *Id.*

---

[11] At no point did the *Elgin* Court say or suggest that it was changing the *Thunder Basin* inquiry or overruling all or part of *Free Enterprise Fund*, which is yet another reason we remain bound by *Free Enterprise Fund*. We "should not lightly assume that a prior decision has been overruled *sub silentio* merely because its reasoning and result appear inconsistent with later cases." *Williams v. Whitley*, 994 F.2d 226, 235 (5th Cir. 1993). As between the directly on-point decision (*Free Enterprise Fund*) and some other decision (*Elgin*), we must follow the former—even if we think it is inconsistent with the latter: "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., The Law of Judicial Precedent 302 (2016).

No. 19-10396

Assuming arguendo that Congress intended § 78y to have a jurisdiction-stripping effect as to some securities-law claims, we advance to step two and hold that Cochran's removal power claim is not the type of claim Congress intended to funnel through the Exchange Act's statutory-review scheme. Our conclusion is supported by the "wholly collateral," "agency expertise," and "meaningful judicial review" *Thunder Basin* factors.

First, Cochran's removal power claim is wholly collateral to the Exchange Act's statutory-review scheme. *Elgin* suggests that whether a claim is collateral to the relevant statutory-review scheme depends on whether that scheme is intended to provide the sort of relief sought by the plaintiff. 567 U.S. at 22 (ruling that the employees' claims were not "wholly collateral to the CSRA scheme" because they were "requesting relief that the CSRA routinely affords"). This rule accords with *Thunder Basin*: although the mine operator in that case brought claims under the NLRA and the Constitution, it ultimately sought to avoid compliance with the Mine Act's posting requirement. 510 U.S. at 205, 213–14. By contrast, the *Free Enterprise Fund* accounting firm did not seek relief of the sort the Exchange Act's scheme is designed to offer; rather than seeking to challenge the propriety of any particular rule or regulation, or to establish that it was not liable for a violation, the accounting firm sought to abolish the PCAOB. 561 U.S. at 490 (explaining that the plaintiffs "object[ed] to the [PCAOB]'s existence"). That is, the accounting firm's claims were structural

---

Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it—it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

constitutional claims, rather than substantive securities claims, and were therefore beyond the bounds of the Exchange Act's statutory-review scheme.

As in *Free Enterprise Fund*, Cochran challenges the existence of SEC ALJs. The nature of her challenge is structural—it does not depend on the validity of any substantive aspect of the Exchange Act, nor of any SEC rule, regulation, or order. Indeed, she is challenging the Exchange Act's statutory-review scheme itself. *Contra Thunder Basin*, 510 U.S. at 218 n.22 (noting that the mine operator "expressly disavow[ed] any abstract challenge to the Mine Act's statutory review scheme"). Further, the outcome of her constitutional challenge to the ALJs' removal protection will have no bearing on her ultimate liability for allegedly violating the securities laws. Consequently, she does not seek relief of the sort the Exchange Act's scheme is designed to provide, meaning that the "wholly collateral" factor weighs against preclusion.

Second, Cochran's removal power claim is outside the SEC's expertise. As in *Free Enterprise Fund*, there is no doubt that Cochran's claim presents only "standard questions of administrative law, which the courts are at no disadvantage in answering." 561 U.S. at 491. For example, her claim does not depend on a special understanding of the securities industry. *Contra Thunder Basin*, 510 U.S. at 214–15 (determining that the mine operator's NLRA challenge was within the Mine Commission's expertise because it rested on interpretation of the Mine Act's posting requirement). Nor is there any suggestion that the SEC is an experienced adjudicator of structural constitutional issues. *See Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021) (noting that "agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas

of technical expertise"). Thus, the "agency expertise" factor also weighs against preclusion.[12]

Third, the Exchange Act's statutory-review scheme threatens to deprive Cochran of the opportunity for meaningful judicial review. *Thunder Basin* and *Elgin* both held that even if the agency was incapable of adjudicating a constitutional claim, meaningful judicial review was still available in the court of appeals. *Thunder Basin*, 510 U.S. at 215; *Elgin*, 567 U.S. at 17. Yet this rule cannot be absolute: even though § 78y similarly provides for eventual court of appeals review, in *Free Enterprise Fund*, the Supreme Court held that the accounting firm "could [not] meaningfully pursue [its] constitutional claims." 561 U.S. at 490. The key question is why *Free Enterprise Fund* had an outcome different from those in *Thunder Basin* and *Elgin*.

The answer is that the *Thunder Basin* and *Elgin* plaintiffs sought substantive relief, while the *Free Enterprise Fund* accounting firm sought

---

[12] *Elgin* is not to the contrary. There, the Court held that the employees' constitutional challenge was not outside the expertise of the MSPB because there were non-constitutional "threshold questions" that, once resolved, could "obviate the need to address the constitutional challenge." *Elgin*, 567 U.S. at 22–23. Here, the SEC might similarly resolve the administrative proceedings in Cochran's favor on a threshold securities-law issue, rather than on the basis of her removal power challenge. But Cochran is not similarly situated to the *Elgin* plaintiffs because she asserts that she will be harmed by the very act of having to appear in proceedings before an ALJ who is unconstitutionally insulated from the President's removal power. Therefore, if the SEC were to decide Cochran's case in her favor on other grounds, it would be denying her any opportunity for meaningful judicial review of her alleged source of harm. By contrast, in *Elgin*, the MSPB could meaningfully review the employees' source of harm—their terminations—without reaching their constitutional challenges. *Id.* Consequently, *Elgin* does not alter our analysis based on *Free Enterprise Fund*. *See Axon Enter.*, 986 F.3d at 1186 (concluding that the Federal Trade Commission lacked the expertise to adjudicate a removal power challenge to its ALJs and explaining that *Elgin* "does not establish a broad rule that an agency can always moot a claim by simply ruling for the party").

No. 19-10396

structural relief: while the mine operator in *Thunder Basin* ultimately desired to avoid potential harm from third parties (the miners), 510 U.S. at 215, the accounting firm in *Free Enterprise Fund* asserted that it was harmed by being investigated by a constitutionally illegitimate agency, 561 U.S. at 490.

That is, the accounting firm in *Free Enterprise Fund* asserted that it was harmed by the structure of the Exchange Act's statutory-review scheme itself.  By contrast, in *Thunder Basin*, the Court determined that the mine operator would face only "speculative" harm if it complied with the Mine Act's statutory-review scheme. 510 U.S. at 216–17.  As for *Elgin*, if the MSPB had granted those plaintiffs the substantive relief they sought— reinstatement, backpay, and attorney's fees—their harm would have been fully redressed, and they would have had no basis to seek further review in the court of appeals.  567 U.S. at 22.  Accordingly, the structural nature of the accounting firm's claim explains the different results in *Free Enterprise Fund* on the one hand and *Thunder Basin* and *Elgin* on the other.

To put it plainly: *Free Enterprise Fund* held that § 78y does not provide an adequate possibility of meaningful judicial review for challenges to the structure of the Exchange Act's statutory-review scheme.  Like the accounting firm in *Free Enterprise Fund*, Cochran is challenging the constitutional authority of her adjudicator.  The Exchange Act's statutory-review scheme does not guarantee Cochran meaningful judicial review of her claim because the enforcement proceedings will not necessarily result in a final adverse order; as a final adverse order is a prerequisite for judicial review under § 78y(a)(1), Cochran may thus be left unable to seek redress for the injury of having to appear before the SEC.  Consequently, "a finding of preclusion could foreclose all meaningful judicial review." *Free Enter. Fund*, 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 212–13).  Therefore, *Free Enterprise Fund* itself as well as all three *Thunder Basin* factors indicate that

21

we should presume that Congress did not intend to preclude district court jurisdiction over Cochran's removal power claim.[13]

The SEC contends Cochran's alleged harm is not irreparable, so it urges us to disregard the possibility that Cochran may never get her day in court. On this point, the SEC relies on *FTC v. Standard Oil Co. of California*, in which the Supreme Court ordered the dismissal of a collateral attack on an administrative enforcement proceeding before the Federal Trade Commission ("FTC"). 449 U.S. 232, 234–37, 247 (1980). There, the Court strongly rebuffed the plaintiff's argument that it would suffer irreparable harm if forced to undergo the administrative proceedings because "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Id.* at 244 (quoting *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974)); *see also id.* (further explaining that "the expense and annoyance of litigation is 'part of the social burden of living under government'" (quoting *Petroleum Expl., Inc. v. Pub. Serv. Comm'n*, 304 U.S. 209, 222 (1938))).

---

[13] Contrary to the SEC's protestations, the *Thunder Basin* factors do not lend any credibility to its argument that we should not follow *Free Enterprise Fund* because Cochran is involved in an ongoing administrative enforcement proceeding. At bottom, the SEC's proffered distinction between pre- and para-enforcement challenges fails to explain the implied preclusion holding in *Thunder Basin*. In that case, the mine operator sought an injunction prior to any adverse order from the Secretary of Labor, meaning that there were no ongoing proceedings at the time the case was filed. *Thunder Basin*, 510 U.S. at 205. If the SEC's interpretation of *Free Enterprise Fund* was right, then the operator in *Thunder Basin* should have been able to proceed with at least its constitutional claims in federal district court. But the Court barred the operator from proceeding with any of its claims. *Id.* Hence, the rule the SEC is apparently proposing—that district court jurisdiction is precluded once administrative proceedings begin but is not precluded prior to the initiation of such proceedings—is untenable. By contrast, our analysis above—focusing on the relief sought by the plaintiff—squares all three of the Supreme Court's major precedents.

By contrast, Cochran challenges the entire legitimacy of her proceedings, not simply the cost and annoyance. Nevertheless, even assuming arguendo that Cochran's alleged harm is "mere litigation expense," we find this argument unpersuasive. *Standard Oil* did not concern implied jurisdiction stripping; rather, the issue before the Court was whether the FTC had taken a "final agency action" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. 449 U.S. at 233, 238. Consequently, *Standard Oil* is irrelevant to our inquiry.[14]

Further, although the threat of irreparable harm may justify pre-enforcement judicial review under principles of equity, *see Ex parte Young*, 209 U.S. 123, 145–48 (1908), irreparable harm is not ordinarily required to invoke a district court's general § 1331 federal question jurisdiction. As the SEC seems to concede, the *Thunder Basin* inquiry offers the only possible path to determining that Cochran cannot rely on § 1331; on that inquiry, the SEC loses so long as "a finding of preclusion *could* foreclose all meaningful judicial review"—no irreparable harm is required. *Free Enter. Fund*, 561 U.S. at 489 (emphasis added) (quoting *Thunder Basin*, 510 U.S. at 212–13). It seems plain that if a plaintiff ends up without any avenue to having her claim heard by a court, judicial review is foreclosed, regardless of whether the harm she suffers is truly irreparable (as Cochran contends it is). To be sure, it is

---

[14] We take no position regarding *Standard Oil*'s relevance to the questions of (1) whether Cochran may rely on the APA's cause of action; and (2) whether she is entitled to a preliminary injunction. *See* 5 U.S.C. § 704 (limiting judicial review under the APA to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court"); *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (noting that to obtain a preliminary injunction, a plaintiff "must establish . . . a substantial threat of irreparable injury if the injunction is not issued" (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009))); *cf. Free Enter. Fund*, 561 U.S. at 508, 513 (holding that the PCAOB's structure violated the Constitution, but nevertheless concluding that the plaintiffs were not entitled to injunctive relief).

No. 19-10396

possible that Cochran could ultimately wind her way through enforcement proceedings and get some later chance at judicial review[15]—but it is also possible that she could never have that opportunity, and that is enough to preserve district court jurisdiction.[16]

_____

[15] At least one individual has successfully followed this path. *See* Pet. for Review, *Jarkesy v. SEC*, No. 20-61007 (5th Cir. Nov. 2, 2020). In addition to *Jarkesy*, the dissenting opinion cites three other cases in which litigants were able to raise separation-of-powers claims in federal court after undergoing administrative proceedings. Dissenting Op. at 81–82 (citing *Lucia*, 138 S. Ct. at 2049–50, *NLRB v. Noel Canning*, 573 U.S. 513, 520–21 (2014), and *Carr*, 141 S. Ct. at 1356–58, 1362). But the fact that only a handful of litigants have been successful in navigating the administrative process demonstrates how difficult that process is—these cases are the exceptions that prove the rule, so to speak. *Cf.* Adam M. Katz, *Eventual Judicial Review*, 118 COLUM. L. REV. 1139, 1153 (2018) (explaining that because the SEC wins the "vast majority" of the cases it brings through administrative proceedings, "the incentive to settle SEC enforcement actions is therefore paramount, making it, practically speaking, extremely unlikely for defendants to . . . have the opportunity to appear before a federal court"). It is the likelihood of success for the many that concerns us; the question is whether delaying Cochran's claims will deny her *meaningful* judicial review, not any possibility of judicial review. Consequently, the cases relied on by the dissenting opinion do not support affirmance.

[16] The dissenting opinion asserts that, because cases like *Lucia* and *Carr* have recognized a meaningful opportunity to bring post-enforcement Appointments Clause challenges, and the injury Cochran would suffer from an enforcement proceeding presided over by an unconstitutionally insulated ALJ is supposedly less "serious" than the injury caused by an enforcement proceeding presided over by an unconstitutionally appointed ALJ, Cochran must have a meaningful opportunity for post-enforcement judicial review of her claim. Dissenting Op. at 83–84. In making this curious argument, the dissenting opinion relies solely on the Supreme Court's recent decision in *Collins*, which held that the Director of the Federal Housing Finance Agency was unconstitutionally insulated from the President's removal power, but that this constitutional defect did not render the Director's acts "void." 141 S. Ct. at 1787.

*Collins* does not impact our conclusion in this case because Cochran does not seek to "void" the acts of any SEC official. Rather, she seeks an administrative adjudication untainted by separation-of-powers violations. Although we will not engage in the dissenting opinion's efforts to weigh the relative severity of constitutional injuries, Cochran's injury is sufficiently serious to justify pre-enforcement review in federal court.

Moreover, the dissenting opinion seems to imply that, because a removal power violation does not render an improperly insulated official's acts void, Cochran would not

The SEC's final fallback position—that *other* statutory schemes will be threatened if we permit structural challenges to the Exchange Act to be brought in district court—fares no better. Specifically, the SEC asserts that there are many administrative schemes similar to the Exchange Act's and that these schemes are equally vulnerable to separation-of-powers challenges. Consequently, the SEC contends, if we carve out structural challenges from what it views as the general rule of implied preclusion, "every person hoping to enjoin an administrative proceeding [will be able to] sue in district court to allege that the proceedings were unconstitutional," wreaking havoc across the Government's operations. This is a "policy consideration[] more properly addressed to Congress than to this Court." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979). Such a consideration surely "cannot govern our reading of the plain language" of § 1331 and § 78y. *Id.*

In any event, there are four reasons that the approach we take today is unlikely to be as disruptive as the SEC fears. First, this case presents only the issue of whether the Exchange Act divested district court jurisdiction over claims that SEC ALJs are unconstitutionally insulated from the President's removal power; our holding extends no further, and the result in other cases, even those concerning similar statutory schemes and claims, may be different.[17] Second, even if Congress did not divest jurisdiction, other

---

be entitled to any relief on post-enforcement review even if she prevailed on her removal power claim. *See* Dissenting Op. at 84. If it were true that Cochran could not obtain any post-enforcement relief, then Cochran's only hope for meaningful judicial review would be through the present lawsuit. Therefore, even under the dissenting opinion's view, Cochran's removal power claim was properly before the district court.

[17] The dissenting opinion asserts that we "make[] no effort" to delineate between structural constitutional claims that go beyond the Exchange Act's statutory-review scheme and substantive securities claims that do not. *See* Dissenting Op. at 86 n.14. But it is unnecessary to delineate between the two because our limited holding applies only to the

doctrines, such as standing, ripeness, exhaustion, sovereign immunity, and abstention, may prevent district courts from hearing challenges to ongoing administrative enforcement proceedings. Third, to actually prevail on their claims, plaintiffs must demonstrate that their arguments are meritorious, a task that will only grow more difficult as more of these cases are resolved and the Government accordingly adjusts its operations (or is ruled to already comply with the Constitution).

Finally, as the Texas Public Policy Foundation notes as *amicus curiae*, our court does not break new ground by allowing Cochran to challenge her adjudicator at the outset of her case. "Since 1792, federal statutes have compelled district judges to recuse themselves when they have an interest in the suit . . . ." *Liteky v. United States*, 510 U.S. 540, 544 (1994). Congress has since enacted statutes to expand judicial recusal requirements. 13D CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3551 (3d ed. 2002) (citing 28 U.S.C. §§ 144, 455). These statutes serve "to protect the parties' basic right to a fair trial in a fair tribunal." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 887 (2009). They also serve to prevent harm to the public's confidence in these tribunals. *In re Sch. Asbestos Litig.*, 977 F.2d 764, 776 (3d Cir. 1992). Given that disqualification disputes concern the basic integrity of a tribunal, they must be resolved at the outset of the litigation. So "virtually every circuit" allows parties to promptly challenge a judge's decision not to recuse. *Id.* at 778 (collecting cases, including from our circuit); *see, e.g.*, *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 165 (5th Cir. 1997) (noting that "mandamus is an

issue presented here—whether the Exchange Act divested district court jurisdiction over claims that SEC ALJs are unconstitutionally protected from removal. Accordingly, our decision will not bear on related statutory-review scheme challenges, including, as the dissenting opinion notes, the issue of whether the Seventh Amendment requires a jury for securities fraud cases being decided in agency proceedings.

appropriate legal vehicle for challenging the denial of a disqualification motion"). That does not create an undue hindrance to the judicial system, and the same logic applies to the SEC's administrative system.

To sum up, Cochran's removal power claim is wholly collateral to the Exchange Act's statutory-review scheme, is outside the SEC's expertise, and might never receive judicial review if district court jurisdiction were precluded. Therefore, the *Thunder Basin* inquiry simply reaffirms that *Free Enterprise Fund* controls this case and that Cochran's removal power claim is within the district court's jurisdiction.

### B.    Ripeness

We now turn to the SEC's other argument for affirmance: a lack of ripeness. Ripeness doctrine reflects "Article III limitations on judicial power" and "prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993); *see also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967) (explaining that the doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The ripeness inquiry hinges on two factors: (1) "the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008) (quoting *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003)). Generally, issues are fit for judicial decision if "any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *Id.* However, some degree of hardship is always required to establish ripeness. *Id.*

There is no dispute that Cochran's removal power claim is a pure issue of law, meaning that it is fit for judicial decision without any additional

fact-finding. Further, if Cochran's claim is meritorious, then withholding judicial consideration would injure her by forcing her to litigate before an ALJ who is unconstitutionally insulated from presidential control. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (determining that the petitioners had adequately demonstrated hardship where withholding judicial review would have forced them to participate in an arbitration proceeding that they alleged to be "ultra vires"); *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 648 (D.C. Cir. 1998) ("The concrete cost of an additional proceeding is a cognizable Article III injury."). Hence, both factors indicate that Cochran's removal power claim is ripe.

In support of its argument that Cochran's claim is not ripe, the SEC principally relies on *Energy Transfer Partners, L.P. v. FERC*, 567 F.3d 134 (5th Cir. 2009), and *TOTAL Gas & Power North America, Inc. v. FERC*, 859 F.3d 325 (5th Cir. 2017). As relevant here, in *Energy Transfer Partners*, a natural gas company challenged the statutory authority of the Federal Energy Regulatory Commission ("FERC") to require it to participate in trial-type enforcement proceedings before an ALJ. 567 F.3d at 137–38. *TOTAL Gas* concerned a similar challenge to FERC administrative proceedings, including a structural claim that FERC ALJs were unconstitutionally appointed. 859 F.3d at 334. In both cases, we concluded that the plaintiffs' claims were not ripe. *Energy Transfer Partners*, 567 F.3d at 146; *TOTAL Gas*, 859 F.3d at 339. Based on these cases, the SEC asserts that structural challenges to ongoing administrative enforcement proceedings are not ripe until those proceedings conclude.

*Energy Transfer Partners* and *TOTAL Gas* are both materially distinguishable from this case. In *Energy Transfer Partners*, the plaintiff sought judicial review of particular FERC orders, which we determined were not sufficiently "final" so as to be susceptible to judicial review. 567 F.3d at 136, 139–44. By contrast, Cochran did not seek review of any particular SEC

order; rather, she sought a declaration that SEC ALJs are unconstitutionally insulated from the president's removal power and an injunction barring the SEC from continuing its administrative proceedings against her. Thus, the concern in *Energy Transfer Partners*—the finality of agency action—is not relevant to the issue of ripeness in this case.

Like Cochran, the *TOTAL Gas* plaintiffs sought a declaration that FERC was precluded from conducting administrative enforcement proceedings against them. 859 F.3d at 327. However, in that case, FERC had not actually scheduled a hearing before an ALJ prior to the plaintiffs filing suit. *Id.* at 336. Consequently, we held that the plaintiffs' fear of being subjected to a constitutionally defective proceeding was too speculative to establish hardship for ripeness purposes. *Id.* at 337 (explaining that "whether FERC ultimately takes actions that Total claims would violate its constitutional rights rests on a series of contingencies and is not a certainty"). As the SEC has already assigned Cochran's case to an ALJ, her risk of hardship is substantially more concrete than in *TOTAL Gas*. Therefore, we hold that Cochran's removal power challenge is ripe.

Accordingly, we AFFIRM the district court's dismissal of Cochran's due process claim, REVERSE the dismissal of her removal power claim, and REMAND for further proceedings consistent with this opinion.

No. 19-10396

Andrew S. Oldham, *Circuit Judge*, joined by Smith, Willett, Duncan, Engelhardt, and Wilson, *Circuit Judges*, concurring.

I agree with the majority that this case can be resolved based on the statutory text in 28 U.S.C. § 1331 and 15 U.S.C. § 78y, along with Supreme Court precedent interpreting those provisions. The dissent nonetheless looks behind text and precedent to the *purposes* and *policies* of the Securities Exchange Act of 1934. I disagree with the dissent for two principal reasons.

First, as should go without saying by now, "our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Here, the text is as unambiguous as can be. Section 1331 creates jurisdiction, and § 78y strips only part of it. The part that § 78y strips (as to "[a] person aggrieved by a final order of the [SEC]") undisputedly does not apply to Cochran. So jurisdiction remains. And any conceivable dispute on that score is resolved by *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010). That should end this case.

Second, even if the dissent is correct to peer behind the text of § 78y, what lurks back there is profoundly disturbing. Section 78y reflects the thinking of men like Woodrow Wilson who argued that universal suffrage would make the three branches of government ignorant, indolent, and incapable of regulating modern affairs. Wilson's solution? He wanted administrative agencies to operate in a separate, anti-constitutional, and anti-democratic space—free from pesky things like law and an increasingly diverse electorate. One of Wilson's acolytes, James Landis, was the SEC's founding father and drafted § 78y into the original Securities Exchange Act. Landis hoped that the SEC could set upon Americans without interference from courts—unless and until the SEC gave courts permission to review its

work. That is obviously not how our government is supposed to work. And in the Landisonian view, that's precisely the point.

The balance of this opinion joins the dissent in considering "the 80-plus year history of the SEC," the purported policy "benefit[s] of agency expertise," and the supposed "efficiency" purpose of § 78y. *Post*, at 70, 90, 94 (Costa, J., dissenting). Part I explains the intellectual and statutory history of § 78y. Part II explains Landis's purposes and policy objectives. Then Part III shows that § 78y falls short of Landis's goal. It fails to give the SEC the separate, anti-constitutional, and unaccountable space Landis wanted. And all of this underscores why it's important to interpret the words that Congress enacted rather than the purposes Landis pursued.[1]

## I.

The separation of powers is the defining feature and virtue of our Constitution. As James Madison wrote, "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47, at 301 (C. Rossiter ed. 1961). So the Founders separated the legislative, executive, and judicial powers into three distinct branches and then balanced them against one another. *See* THE FEDERALIST NO. 51, at 321–23; *Bowsher v. Synar*, 478 U.S. 714, 722 (1986) ("Even a cursory examination of the Constitution reveals the influence of Montesquieu's thesis that checks

---

[1] I obviously do not think that any of my esteemed colleagues are sympathetic to the profoundly anti-democratic views that motivated the SEC's founding fathers. To the contrary, I have the utmost respect for my colleagues, and I believe that all of us are attempting to interpret the law as Congress wrote it and not as Landis imagined it. I also believe, however, that we should take seriously the origins of § 78y rather than dismiss them as a "screed." *Post*, at 70 n.2 (Costa, J., dissenting).

and balances were the foundation of a structure of government that would protect liberty.").

Wilson and Landis fundamentally disagreed with the Founders' vision. Wilson and Landis thought the accumulation of all powers into one set of hands was—far from a vice—a virtue. And they wanted those all-powerful hands connected to an administrative agency, far away from the three branches of government the Founders worked so hard to create, separate, and balance. And most of all, Wilson and Landis wanted power as far away from democracy and universal suffrage as possible.

## A.

Woodrow Wilson derived his political theories from German historicism. *See* RONALD J. PESTRITTO, WOODROW WILSON AND THE ROOTS OF MODERN LIBERALISM 14 (2005); PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 458 (2014). In 1883, Wilson began his doctoral studies in history and government at Johns Hopkins, where he studied under professors who had themselves been educated in Germany—most notably, Richard T. Ely and Herbert Baxter Adams, who both studied at the University of Heidelberg under Johann K. Bluntschli, a renowned Hegelian state theorist. PESTRITTO, *supra*, at 8, 18. These German historicists considered history an evolutionary process. *See id.* at 9, 14 (citing Joseph Dorfman, *The Role of the German Historical School in American Economic Thought*, 45 AM. ECON. REV. 17 (1955)). They viewed history as "a progression of . . . epochs," through which each age's "spirit" becomes more advanced than the one preceding it. *Id.* at 15. "More advanced historical spirits replace inferior ones through a dialectical process, where progress is the result of great clashes, conflicts, and struggles." *Ibid.* (citing G.W.F. HEGEL, THE PHILOSOPHY OF HISTORY 17–18 (J. Sibree

trans., Dover Publ'ns 1956)).[2] "[H]istoricism has a particular future in mind, and progress is all about reaching it." *Id.* at 16.

In Wilson's view, administration was key to reaching his idealized future. Wilson lamented that "[u]p to [his] own day all the political writers . . . had thought, argued, dogmatized only about the *constitution* of government; about the nature of the state, the essence and seat of sovereignty, popular power and kingly prerogative; about the greatest meanings lying at the heart of government; and the high ends set before the purpose of government by man's nature and man's aims." Woodrow Wilson, *The Study of Administration*, 2 POL. SCI. Q. 197, 198 (1887). Back when the nation was founded, he wrote, "[t]he functions of government were simple, because life itself was simple." *Id.* at 199. But things were different now: The "difficulties of governmental action" in the modern era required a new "science of administration which shall seek to straighten the paths of government, . . . [and] strengthen and purify its organization." *Id.* at 200–01.

Wilson lauded Europe for embracing this new science and chided America for supposedly staying stuck in the past. The study of administration, Wilson noted, "is a foreign science, speaking very little of the language of English or American principle. It employs only foreign tongues; it utters none but what are to our minds alien ideas." *Id.* at 202. Though Wilson appeared to recognize the implications of adopting German political principles, he tried to reassure liberty-minded readers that administration could be "Americanize[d]." *Ibid.* As Wilson put it:

> If I see a murderous fellow sharpening a knife cleverly, I can borrow his way of sharpening the knife without borrowing his

---

[2] Hegel, like Wilson, held outrageous views on race. Hegel's dialectic depended in part on "advanced races" clashing with "inferior ones" and then either "defeating them" "or assimilating them." PESTRITTO, *supra*, at 15.

No. 19-10396

probable intention to commit murder with it; and so, if I see a monarchist dyed in the wool managing a public bureau well, I can learn his business methods without changing one of my republican spots. . . . We can thus scrutinize the anatomy of foreign governments without fear of getting any of their diseases into our veins; dissect alien systems without apprehension of blood poisoning.

*Id.* at 220.

Notwithstanding his reassurance that German political principles could be Americanized, Wilson elsewhere made clear that he would scrap the Constitution if he could. One of his most notable departures from the Constitution was his distaste for democracy and popular sovereignty—especially after the document was amended to allow for an increasingly diverse electorate. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 129 n.6 (2015) (Thomas, J., concurring in the judgment) (crediting Wilson's "deep disdain for the theory of popular sovereignty" as contributing to the Progressive Era's "move from the individualism that had long characterized American society to the concept of a society organized for collective action"); HAMBURGER, *supra*, at 371 n.e (noting that Wilson despised democracy and described it as "a stage of development" that had to be left behind).

During his early career—including his time at Johns Hopkins—Wilson "complained bitterly about the ills of universal suffrage." PESTRITTO, *supra*, at 201. In his notes on English historian John Richard Green, Wilson rhetorically questioned:

Is the principle of universal suffrage for instance consistent with those principles of government which bear the sanction of the wisest Englishmen of eight centuries and which have secured personal freedom and political liberty to a great nation

34

for more than eight hundred years? Is it necessary or even compatible with the healthy operation of a free government?

Woodrow Wilson, *Marginal Notes on John Richard Green*, *in* 1 THE PAPERS OF WOODROW WILSON 388 (Arthur S. Link ed., 1966). One entry in his diary—which stated that "universal suffrage is at the foundation of every evil in this country"—indicates that Wilson had answered his own questions: "no" and "no." Woodrow Wilson, *Shorthand Diary*, *in* 1 PAPERS, *supra*, at 143. And these views didn't stay on the pages of his private papers. He also included them in his seminal work on administration:

> Even if we had clear insight into all the political past, and could form out of perfectly instructed heads a few steady, infallible, placidly wise maxims of government into which all sound political doctrine would be ultimately resolvable, would the country act on them? That is the question. The bulk of mankind is rigidly unphilosophical, and nowadays the bulk of mankind votes. A truth must become not only plain but also commonplace before it will be seen by the people who go to their work very early in the morning; and not to act upon it must involve great and pinching inconveniences before these same people will make up their minds to act upon it.
>
> And where is this unphilosophical bulk of mankind more multifarious in its composition than in the United States? To know the public mind of this country, one must know the mind, not of Americans of the older stocks only, but also of Irishmen, of Germans, of negroes. In order to get a footing for new doctrine, one must influence minds cast in every mould of race, minds inheriting every bias of environment, warped by the histories of a score of different nations, warmed or chilled, closed or expanded by almost every climate of the globe.

Wilson, *The Study of Administration*, *supra*, at 209. And though Wilson "dropped his overt opposition to universal suffrage as he matured," even his

post-presidency works remained steeped in racism. PESTRITTO, *supra*, at 202; *see, e.g.*, WOODROW WILSON, THE STATE 17, 20 (1918) (contrasting "progressive races" and "stagnated nationalities").[3]

Wilson's concern with democracy was that it "assume[s] a discriminating judgment and a fullness of information on the part of the people touching questions of public policy." WILSON, THE STATE, *supra*, at 305. But because he believed people "do not often possess" such judgment, *ibid.*, Wilson concluded that "[t]he people should not govern; they should elect the governors: and these governors should be elected for periods long enough to give time for policies not too heedful of transient breezes of public opinion," Woodrow Wilson, *Notes for "The Philosophy of Politics"*, *in* 9 PAPERS, *supra*, at 132; *but see Perez*, 575 U.S. at 129 n.6 (Thomas, J., concurring in the judgment) ("In President Wilson's view, public criticism would be beneficial in the formation of overall policy, but 'a clumsy nuisance' in the daily life of Government—'a rustic handling delicate machinery.'" (quoting Wilson, *The Study of Administration*, *supra*, at 215)). And if a government official *must* consult the public, he should have to hear only "those who hit upon opinions fit to be made prevalent, and have the capacity to make them so." Woodrow Wilson, *Democracy*, *in* 7 PAPERS, *supra*, at 355.

---

[3] Some believe Wilson's views were based on his upbringing in the Confederate South. *See, e.g.*, Dan McLaughlin, *The Confederate Roots of the Administrative State*, NATIONAL REVIEW (July 30, 2020) ("Bureaucratic, unelected, managerial government in America had a surprising birthplace: the Confederate States of America. It would ultimately be imported into the theory and practice of the federal government by a son of the Confederacy: Woodrow Wilson."). Others trace his opinions to German historicism. *See, e.g.*, PESTRITTO, *supra*, at 44 ("Wilson's racism lies at a much more fundamental level than mere prejudice. For him, some races are advanced historically and others are backward; the best thing that can happen to the inferior races and peoples is to be defeated and assimilated by their historical superiors."); *see also supra* n.2 (recounting Hegel's view of slavery).

No. 19-10396

In Wilson's mind, most modern Americans didn't meet that standard. *See* Hamburger, *supra*, at 370–71 (describing Wilson's classism and his view that administration had the virtue of insulating elite power from popular politics).

Wilson ran into an obvious problem: The Constitution affirmatively prohibited the anti-democratic administrative system he wanted. Wilson saw the separation of powers and the Founders' system of checks and balances as two of the Constitution's chief defects. While at Johns Hopkins, Wilson wrote:

> It is . . . manifestly a radical defect in our federal system that it parcels out power and confuses responsibility as it does. The main purpose of the Convention of 1787 seems to have been to accomplish this grievous mistake. The "literary theory" of checks and balances is simply a consistent account of what our constitution-makers tried to do; and those checks and balances have proved mischievous just to the extent to which they have succeeded in establishing themselves as realities. It is quite safe to say that were it possible to call together again the members of that wonderful Convention to view the work of their hands in the light of the century that has tested it, they would be the first to admit that the only fruit of dividing power had been to make it irresponsible.

Woodrow Wilson, Congressional Government: A Study in American Politics 187 (1885). Like democracy, Wilson thought such structural limitations on power were unnecessary and even incompatible with a functional government. In Wilson's view: "No living thing can have its organs offset against each other, as checks, and live." Woodrow Wilson, The New Freedom 47 (1913).

Wilson's primary criticism of the separation of powers was that it made government inflexible and inefficient. *See* Pestritto, *supra*, at 5

("Each of these features, to Wilson's mind, made American government inflexible and incapable of adjustment to necessary historical change."). And a government that was inflexible and inefficient could only trudge—not sprint—toward progress:

> It was the separation of powers that, among all of the objects of Wilson's criticism in the founders' Constitution, caused him the greatest distress and occupied much of his attention. For Wilson, the separation of powers, and all of the other institutional remedies that the founders employed against the danger of faction, stood in the way of government's exercising its power in accord with the dictates of progress.

*Id.* at 6. For Wilson, that simply would not do.

Wilson therefore set out his own anti-constitutional vision in *The Study of Administration*. "Judging by the constitutional histories of the chief nations of the modern world," Wilson believed there were "three periods of growth through which government has passed in all the most highly developed of existing systems." Wilson, *The Study of Administration*, *supra*, at 204. Nations begin in the period of "absolute rulers, and of an administrative system adapted to absolute rule." *Ibid.* As they progress, they reach the second period, "that in which constitutions are framed to do away with absolute rulers and substitute popular control, in which administration is neglected for these higher concerns." *Ibid.* And finally, they reach a level of sophistication "in which the sovereign people undertake to develop administration under this new constitution which has brought them into power." *Ibid.* Wilson was ready to lead America past its own Constitution and into the third period "under this new constitution." *Ibid.*

Wilson's "new constitution" would ditch the Founders' tripartite system and their checks and balances for a "more efficient separation of politics and administration, which w[ould] enable the bureaucracy to tend to

the details of administering progress without being encumbered by the inefficiencies of politics." PESTRITTO, *supra*, at 227. The "political" sector would encompass the three constitutional branches, while the "administration" sector would operate independently. Wilson's goal was to completely separate "the province of constitutional law" from "the province of administrative function." HAMBURGER, *supra*, at 464.

Within this new dichotomy, the emphasis in government would shift to administration. This newly conceptualized government—with a new administrative "branch"—would "see[] to the daily rulemaking and regulation of public life." PESTRITTO, *supra*, at 165 (citing WOODROW WILSON, CONSTITUTIONAL GOVERNMENT IN THE UNITED STATES 82–85 (1908)). "Administration, after all, is properly the province of scientific experts in the bureaucracy; the experts' competence in the specific technological means required to achieve those ends on which we are all agreed gives them the authority to administer or regulate progress, unhindered by the realm of politics." *Id.* at 127–28.

That of course required concomitant changes to the three branches of constitutional government. And rather than amend the Constitution to accomplish his purposes, Wilson thought it would be far more efficient to simply command the three branches to *submit*. In Wilson's view, Congress must "understand its appropriate role in modern times." *Id.* at 136. Specifically, it must "abandon its stubborn insistence on its constitutionally defined duty to legislate" and "cede[] rulemaking authority to the bureaucracy." *Ibid.* Only then could Congress step into its new role in "oversee[ing] this function, not . . . attempt[ing] to carry it out itself." *Id.* at 165.

The same was true of the President. In Wilson's view, a modern President must "look beyond his role as it is defined in the Constitution." *Id.*

at 168. The modern president should be focused on connecting to the public and coordinating the government's activities to the end of progress.

So too with the courts. Wilson subscribed to Bagehot's theory of a "living constitution," and he believed that judges should "reflect what it is that each generation wants out of government, and not [remain] stuck on an outdated understanding of the purpose and role of government." *Id.* at 115–17. "[T]he members of the courts are necessarily men of their own generation," and Wilson "would not wish to have them men from another." Wilson, Constitutional Government, *supra*, at 185, 193.

## B.

In the 1930s, President Franklin D. Roosevelt, James Landis, and their fellow progressives picked up where Wilson had left off. "Reflecting th[e] belief that bureaucrats might more effectively govern the country than the American people, the progressives ushered in significant expansions of the administrative state, ultimately culminating in the New Deal." *Perez*, 575 U.S. at 129 n.6 (Thomas, J., concurring in the judgment).

One of Roosevelt's most pressing progressive projects was securities reform—an issue of debate since the 1907 stock market crash, which came back into the spotlight after the 1929 market crash and the Depression. During his presidential campaign, Roosevelt's platform "advocated 'regulation to the full extent of federal power, of . . . exchanges in securities and commodities.'" Steve Thel, *The Original Conception of Section 10(b) of the Securities Exchange Act*, 42 Stan. L. Rev. 385, 414 (1990) (quoting 7 History of American Presidential Elections 2742–43 (A. Schlesinger, Jr. ed. 1985)).

"The process of transforming Roosevelt's securities policy into a bill began within hours of Roosevelt's election." Joel Seligman, The Transformation of Wall Street 50 (1982). Roosevelt's advisor,

Felix Frankfurter, "looked to assemble a team to assist the new administration in crafting a plan to implement the goals on which Roosevelt had campaigned." Ronald J. Pestritto, *The Progressive Origins of the Administrative State*, 24 Soc. Phil. & Pol'y 16, 26 (2007). Frankfurter's team included Landis—his junior colleague at Harvard Law School—and several other up-and-comers in the field of administrative law. *Ibid.* "[T]he bill that became the Securities Act of 1933 was drafted over a weekend by James Landis, Benjamin Cohen, and Thomas Corcoran, who were perhaps aided by an excess of Scotch." Cynthia A. Williams, *The Securities and Exchange Commission and Corporate Social Transparency*, 112 Harv. L. Rev. 1197, 1227 (1999) (citing Larry D. Soderquist & Theresa A. Gabaldon, Securities Law 12 (1998) (discussing the legend that the rushed Act was drafted over a case of Scotch)). Congress vested enforcement of the 1933 Act in the newly created Federal Trade Commission—and confirmed Landis as one of its inaugural Commissioners.

The next year, in 1934, Roosevelt decided to go further. And whom did Roosevelt tap to lead the effort? Landis, of course. *See* Karl Shumpei Okamoto, *Rereading Section 16(B) of the Securities Exchange Act*, 27 Ga. L. Rev. 183, 229 n.153 (1992) (describing Landis as "the principal architect of the [1934] Exchange Act"). Landis's first draft of the bill contained a judicial-review provision that is virtually identical to the one Congress enacted in 1934 and that continues to exist in § 78y today. Section 23(a) of Landis's draft provided in full:

> Any person aggrieved by an order of the Commission may obtain a review of such order in the Circuit Court of Appeals of the United States, with any circuit wherein such person resides or has his principal place of business, or in the Court of Appeals of the District of Columbia, by filing in such court, within sixty days after the entry of such order, a written petition praying that the order of the Commission be modified or be set aside in

No. 19-10396

whole or in part. A copy of such petition shall be forthwith served upon the Commission, and thereupon the Commission shall certify and file in the court a transcript of the record upon which the order complained of was entered. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission. The finding of the Commission as to the facts, if supported by evidence, shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence the hearing before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The jurisdiction of the court shall be exclusive and its judgment an decree, affirming, modifying, or setting side, in whole or in part, any order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in sections 23 and 240 of the Judicial Code as amended (U.S.C. title 28, secs. 346 and 347).

H.R. 7852, 73d Cong. § 23(a) (1934).

Roosevelt reviewed Landis's draft bill, and he recommended it go straight to Congress. Thel, *supra*, at 424–25. When the bill reached the House Committee on Interstate and Foreign Commerce, Landis was the first witness to testify. *Id.* at 395 n.39. And Landis told Congress that, naturally, he and his agency would be perfect for enforcing the new 1934 Act: "The Federal Trade Commission, I think, can be credited with efficiency in

operation, a tradition of true service, and one of integrity; all qualities demanded by an act of this type, and for that reason, the Commission itself, I think, feels that it would like to undertake an activity of this type." *Stock Exchange Regulation: Hearing on H.R. 7852 and H.R. 8720 Before the H. Comm. on Interstate and Foreign Commerce*, 73d Cong. 23 (1934) (statement of James M. Landis, Commissioner, Federal Trade Commission). Congress reached a sort of compromise. It adopted Landis's bill—including the provision that today appears in § 78y; rejected his request to make the FTC responsible for enforcing it; but then confirmed Landis to lead the new agency (the Securities and Exchange Commission) it created to enforce the 1934 Act. *See* Securities Exchange Act of 1934, Pub. L. No. 73-291, § 25(a), 48 Stat. 881, 901–02; Erwin N. Griswold, *James McCauley Landis—1899-1964*, 78 HARV. L. REV. 313, 314 (1964).

## II.

The dissent makes much of the *purposes* behind the 1934 Act—including the so-called "investigation/enforcement distinction," the importance of agency expertise, and the SEC's purported need to complete its work without judicial oversight. Obviously, none of this is in the *text* of the Act itself.

It's true, however, that these purposivist concepts date back to Landis. Landis was convinced that bureaucrats had a monopoly on governmental wisdom and that their critics were simply too stupid to understand it. For example, Landis thought it "[s]omewhat hysterical[]" that some derogatorily labeled the administrative state as the "fourth branch" of government. JAMES M. LANDIS, THE ADMINISTRATIVE PROCESS 47 (1938). He viewed the condemnation of the fourth branch as superstitious—based "upon the mystical hypothesis that the number 'four' bespeaks evil or waste as contrasted with some beneficence emanating from

the number 'three.'" *Ibid.* And he chided these critics as being hindered by "a too casual reading of constitutional history." *Ibid.*

Landis took particular umbrage at criticisms from the judiciary. Judges who failed to appreciate the SEC's efforts were as ignorant as Americans guided by numerology. And that's why Landis did not trust courts to review the SEC's work. To the contrary, Landis wanted *agencies* to do *the courts'* work.

### A.

In *The Administrative Process*, Landis described the SEC's process for investigating potentially fraudulent statements included in a securities registration form. *See id.* at 136–37. When a registrant filed a statement including seemingly fraudulent statements, the SEC would begin "[a] quiet investigation into the facts." *Id.* at 137. If the investigation led the SEC to believe there was in fact fraud, the agency would impose a stop order against the registrant. *Ibid.* To avoid public attention and the pain of such proceedings, registrants would often try to withdraw their registration statements. *Ibid.* Landis did not think the SEC's targets should get off so easily, however. So the SEC promulgated a rule that disallowed registrants from withdrawing their registration statements without the Commission's consent. *Ibid.* And pursuant to that rule, the SEC would deny its consent and force registrants to defend themselves before the Commission—even after the registrants stated that they did not want to defend themselves or their statements. *Ibid.*

One such registrant challenged the rule and the SEC's enforcement practices. *See Jones v. SEC*, 298 U.S. 1 (1936). The petitioner asked the Court: (1) whether the SEC could deny a request to withdraw a registration statement, *see id.* at 18–25; and if so, (2) whether the SEC had the authority

to interrogate the registrant about allegedly fraudulent propositions in his registration statement after it had been withdrawn, *see id.* at 25–29.

In a stinging rebuke of the SEC, the Court answered each question with an emphatic "no." The Court concluded that "[t]he act contains no provision upon the subject; and it may not be construed as attempting to confer upon the commission an arbitrary power, under rule or otherwise, to deny, without reason, a motion to dismiss." *Id.* at 19. Not only was the Act silent—the Court was also "unable to find any precedent for the assumption of such power on the part of an administrative body." *Ibid.* And, of course, "at least in the absence of a statute to the contrary, the power of a commission to refuse to dismiss a proceeding on motion of the one who instituted it cannot be greater than the power which may be exercised by the judicial tribunals of the land under similar circumstances." *Ibid.* Given the general rule for the federal courts—"that a plaintiff possesses the unqualified right to dismiss his complaint at law or his bill in equity unless some plain legal prejudice will result to the defendant other than the mere prospect of a second litigation upon the subject matter"—the SEC would need to show prejudice. *Ibid.* That it could not do. *Id.* at 22 ("We are unable to find anything in the record, the arguments of the commission, or the decision of the court below that suggests the possibility of any prejudice to the public or investors beyond the assumption . . . that an unlimited privilege of withdrawal would have the effect of allowing registrants whose statements are defective, to withdraw before a stop order was issued and then to submit another statement with slight changes." (quotation omitted)).

The Court could have concluded there. But instead, it proceeded to explain the danger of adopting the SEC's argument to the contrary:

> The action of the commission finds no support in right principle or in law. It is wholly unreasonable and arbitrary. It violates the cardinal precept upon which the constitutional

> safeguards of personal liberty ultimately rest—that this shall be a government of laws—because to the precise extent that the mere will of an official or an official body is permitted to take the place of allowable official discretion or to supplant the standing law as a rule of human conduct, the government ceases to be one of laws and becomes an autocracy. Against the threat of such a contingency the courts have always been vigilant, and, if they are to perform their constitutional duties in the future, must never cease to be vigilant, to detect and turn aside the danger at its beginning.

*Id.* at 23–24. If administrative agencies "are permitted gradually to extend their powers by encroachments—even petty encroachments—upon the fundamental right, privileges and immunities of the people," the Court warned that "we shall in the end, while avoiding the fatal consequences of a supreme autocracy, become submerged by a multitude of minor invasions of personal rights, less destructive but no less violative of constitutional guaranties." *Id.* at 24–25.

Having determined that the registrant was entitled to withdraw his registration statement, the Court continued to consider whether the SEC may nevertheless interrogate him. *See id.* at 25. Given the reason for the stop order had disappeared, the Court concluded that there was no longer any basis to hail the registrant before the tribunal. *Ibid.* To require his presence without reason, the Court stated, would lead to a mere "'fishing expedition . . . for the chance that something discreditable might turn up'—an undertaking which uniformly has met with judicial condemnation." *Id.* at 26 (alteration in original) (quoting *Ellis v. Interstate Commerce Comm'n*, 237 U.S. 434, 445 (1915)). And "[t]he fear that some malefactor may go unwhipped of justice weighs as nothing against this just and strong condemnation of a practice so odious." *Id.* at 27.

What's more, there was no reason for the agency to insist upon its own adjudication in the first place. The Constitution anticipated violations such as fraud, and it instituted both a tribunal and proper procedures to review such allegations: "The federal courts are open to the government; and the grand jury abides as the appropriate constitutional medium for the preliminary investigation of crime and the presentment of the accused for trial." *Id.* at 27. An investigation that disregards Article III and the Fifth Amendment "is unlawful in its inception and cannot be made lawful by what it may bring, or by what it actually succeeds in bringing, to light." *Ibid.*; *see also id.* at 26–28 (citing *In re Pac. Ry. Comm'n*, 32 F. 241 (N.D. Cal. 1887) (Field, J.) (prohibiting unlawful inquisitorial investigations); *Boyd v. United States*, 116 U.S. 616 (1886) (prohibiting compulsory self-accusation); *Entick v. Carrington*, 19 How. St. Tr. 1030 (1765) (prohibiting unlawful searches and seizures)). Allowing such investigations would bring back "those intolerable abuses of the Star Chamber, which brought that institution to an end at the hands of the Long Parliament in 1640." *Id.* at 28. Based on that brooding risk, the Court concluded, "[e]ven the shortest step in the direction of curtailing [individual] rights must be halted in limine, lest it serve as a precedent for further advances in the same direction, or for wrongful invasions of the others." *Ibid.*

Landis stated that he was "startle[d]" by the Court's stinging rebuke of his brainchild. LANDIS, *supra*, at 138. Had the Court stopped after concluding that the SEC should have allowed the registrant to withdraw his registration statement, Landis said, "one might have regretted its conclusion as weighting the scales in favor of fraudulent promoters, but that would have been all." *Ibid.* Instead, the Court went on to compare the SEC to the Star Chamber:

> Such an outburst indicates that one is in a field where calm
> judicial temper has fled. Deep feelings underlie this unguarded

language of Mr. Justice Sutherland. They underlie, too, the suggestion by the Chief Justice that the administrative is prone to abuse the powers intrusted it. . . . If it is fair to apply the legal rule that one intends the natural and probable consequences of his acts, certainly the effect if not the purpose was to breed distrust of the administrative.

*Id.* at 139–40.

Landis was deeply frustrated by the *Jones* Court's rhetoric. In Landis's view, the Court's reaction to the SEC's efforts could be explained only by the judiciary's inability to understand his wisdom. And that judicial ignorance spilled over to the public, again to Landis's chagrin. Following the Court's decision in *Jones*, "every effort [by the SEC] to deal with fraudulent promoters was met by the accusation that Star Chamber tactics were being employed." *Id.* at 140. Thus Landis lamented that America's profoundly ignorant people, "who have neither time nor the ability to grasp the precise issue involved by a particular case," understood the SEC's "administrative action as arbitrary and violative of ancient rights and privileges." *Ibid.* That was the judiciary's fault—not the SEC's.

## B.

Landis convinced himself that administrative agencies were superior to courts in every relevant way. *See id.* at 95–97 (arguing the judiciary's role should be "committed to the administrative for protection"). Landis presented several reasons for the supposed superiority. For one, agency adjudications were more efficient than court cases. *See id.* at 19 ("The decisions of those [administrative] authorities which exercise judicial powers are said to be several times as numerous as the recorded decisions of all the Federal judicial courts." (quotation omitted)). As another, their standards and procedures were more practical. *See id.* at 49–50 ("Its bending of judicial doctrine and procedure to realistic curvatures tends sometimes to offend the

courts that supervise its activities."). And of course, they were much more modern. *See id.* at 96–97 ("Judicial interpretation suffered not only from inexpertness but more from the slowness of that process to attune itself to the demands of the day.").

But above all, Landis emphasized, administrative agencies were staffed by *experts*—unlike the common lawyers who served in the Third Branch. Judges were "jacks-of-all-trades and masters of none" due to their "breadth of jurisdiction and freedom of disposition." *Id.* at 31. And if there's anything worse than a judge who's unaware of his own "inadequacies," *id.* at 123, it's a judge who's both inadequate and *prideful*. "We must remember," Landis told his readers, "until a comparatively short time ago Anglo-American government was essentially government by judges." *Id.* at 135. "That class . . . had pride in its handiwork," he continued, "[b]ut the claim to pride tends, especially in the hands of lesser men, to be a boast of perfection." *Ibid.* Secretly insecure about their "lesser vision," the judges "claim[ed] Delphic powers, and rest[ed] the learning of the law upon an affinity with deep and mysterious principles of justice that none but itself can grasp." *Ibid.* Hearing "any criticism of its inadequacies, any suggestion as to its biases," the judiciary developed a "[d]eep resentment" toward the expert administrators. *Ibid.* "To admit to the dispensation of justice other individuals, no matter how wise, who are not bound by the older disciplines, [wa]s regarded by horror." *Ibid.*

Landis's solution to this problem was the same as Wilson's: eliminate or at least minimize the role of courts in our constitutional system. Obviously, it would be best to eliminate the courts altogether. Otherwise, "lodg[ing] a great, interpretive power in the judiciary involved the risk that a policy, which initially was given to the administrative to formulate, might be thwarted at its most significant fulcrum by judgments antagonistic to its own." *Id.* at 97. It would be far better, in Landis's view, that the SEC could

No. 19-10396

simply interrogate its targets *ad infinitum*—without the *Jones* Court *ever* getting the right to interfere.

But if courts simply must be part of our constitutional order, Landis said, their role must be minimized as far as possible. Landis disputed the idea that all administrative action must be judicially reviewable. *Id.* at 124. Rather, courts should be confined to determining little things—like "the regularity of the procedure employed by the administrative" agency. *Ibid.* And Landis was heartened by the Interwar Congresses, which tended "to decrease rather than to increase the power of judges to impose checks upon the exercise of administrative power." *Id.* at 100.

III.

While it's clear that Landis *wanted* to fully insulate his brainchild agency against judicial oversight, it's equally clear that the text passed by Congress and signed by the President did not accomplish that purpose. As the Supreme Court recently reminded us:

> Efforts to ascribe unenacted purposes and objectives to a federal statute face many of the same challenges as inquiries into state legislative intent. Trying to discern what motivates legislators individually and collectively invites speculation and risks overlooking the reality that individual Members of Congress often pursue multiple and competing purposes, many of which are compromised to secure a law's passage and few of which are fully realized in the final product.

*Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907–08 (2019); *see also Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam) ("[N]o legislation pursues its purposes at all costs.").

In this case, however, both the dissent and the SEC would have us read § 78y to accomplish Landis's wildest dreams. The SEC's litigation position is a combination of "trust us, we're the experts" and "there will be

time for judicial review when we're good and ready, thank you." And the dissent insists that our rejection of that position will "inject[] federal courts into sensitive interbranch disputes." *Post*, at 95 (Costa, J., dissenting). I respectfully disagree with the SEC and the dissent, for all the reasons given in the majority opinion. Here I merely respond to the dissent's three principal arguments to underscore our conclusion that the words in § 78y enacted by Congress—as opposed to the unenacted purposes that motivated Landis—do not strip jurisdiction over Cochran's removal claim.[4]

A.

The dissent breaks from the majority most sharply by distinguishing this case from the Supreme Court's materially identical case, *Free Enterprise*. Though both cases involve plaintiffs challenging the removability of the SEC adjudicators overseeing their respective administrative proceedings, the

---

[4] Remarkably, Cochran's removal claim is *also* connected to Wilson and Landis. President Wilson and Louis Brandeis became friends during Wilson's 1912 presidential campaign. *See* G. Edward White, *Allocating Power Between Agencies and Courts: The Legacy of Justice Brandeis*, 1974 Duke L.J. 195, 205 (1974). Brandeis then participated in drafting the FTC's organic statute. *Ibid.* Then, during the Supreme Court's 1925–26 Term, Brandeis's law clerk was none other than—you guessed it, Landis. And in that Term, the Court heard *Myers v. United States*, 272 U.S. 52 (1926)—the canonical removal-power decision by Chief Justice Taft, which held that the President has the exclusive power to remove executive officers. Brandeis, of course, dissented. "Both Landis and Brandeis recognized the threat that this ruling posed to the development of a modern administrative apparatus with significant discretionary powers and independence from the realm of politics, and thus Landis worked closely on his *Myers* dissent." Pestritto, *Progressive Origins*, *supra*, at 30–31. Then, ironically, it was Landis who convinced Roosevelt that he had constitutional power to remove William E. Humphrey from his position at the FTC—thus giving rise to the landmark decision in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which limited *Myers* and largely vindicated the Brandeis dissent. Although Roosevelt followed Landis's advice and lost *Humphrey's Executor*, Landis was "quite pleased" with the result. Pestritto, *Progressive Origins*, *supra*, at 31. "[T]he defeat for the president was meaningless in comparison with the great independence for administrators that the *Humphrey's* decision helped to secure." *Ibid.*

dissent says *Free Enterprise* (which involved a pending SEC *investigative* proceeding) doesn't apply in a case like Cochran's (which involves a pending SEC *enforcement* proceeding). *See post*, at 83–88 (Costa, J., dissenting). Our sister circuits have made the same distinction. *See, e.g.*, *Hill v. SEC*, 825 F.3d 1236, 1248 (11th Cir. 2016) (finding the district court lacked jurisdiction because "[u]nlike the petitioners in *Free Enterprise Fund*," Hill was the subject of an SEC enforcement proceeding); *Bennett v. SEC*, 844 F.3d 174, 182 (4th Cir. 2016) (distinguishing between an SEC "inspection or investigation" and an SEC "disciplinary proceeding"). But the investigation-enforcement dichotomy is a distinction without a textual or practical difference.

1.

Let's start with the text. The current version of § 78y is almost identical to the provision Landis wrote in 1934. *See supra*, at 12 (quoting § 23(a) as proposed and as enacted by Congress without material change in § 25(a) of the 1934 Act). Today the provision reads:

> A person aggrieved by a final order of the Commission entered pursuant to this chapter may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit, by filing in such court, within sixty days after the entry of the order, a written petition requesting that the order be modified or set aside in whole or in part.

15 U.S.C. § 78y(a)(1).[5] Though Landis surely intended to filter (and succeeded in filtering) as much litigation as possible through the SEC's own

---

[5] Under the 1934 Act as Landis wrote it, "[a]ny person aggrieved by *an order* issued by the Commission" could seek judicial review, § 25(a), 48 Stat. at 901 (emphasis added), whereas the current version of § 78y applies to "[a] person aggrieved by a *final* order of the Commission," 15 U.S.C. § 78y(a)(1) (emphasis added). Congress did not add the word

---

"final" to § 78y until 1975. *See* Securities Acts Amendments of 1975, Pub. L. No. 94-29, § 20, 89 Stat. 97, 158. Two points about these texts bear emphasis.

First, Landis's version of the statute precluded even more judicial review than the current version of § 78y. That's because Landis also included an *exhaustion* requirement, and under the common law that existed at the time, such exhaustion requirements disallowed judicial review of non-final agency action. *See* § 25(a), 48 Stat. at 902 ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission."). As the Supreme Court once emphasized, such exhaustion requirements—not the "any person aggrieved by an order" language—operated to deny or delay judicial review:

> [T]he long-settled rule of judicial administration [is] that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. That rule has been repeatedly acted on in cases where, as here, the contention is made that the administrative body lacked power over the subject matter. Obviously, the rules requiring exhaustion of the administrative remedy cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage.

*Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938). And it cannot be contended that Congress added the word "final" to import this exhaustion-based denial of judicial review into § 78y because the same 1975 amendment that added the word "final" *also* retained the exhaustion requirement. *See* § 20, 89 Stat. at 159. Thus, whatever work the word "final" does after 1975, it cannot be read to duplicate the work done by the exhaustion requirement in Landis's bill. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) (describing the canon against surplusage). (Nor can § 78y(c)(1)'s current exhaustion requirement do the work it did back in Landis's day without destroying multiple modern doctrines—including *Thunder Basin* and pre-enforcement review under *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)—that authorize judicial review before the conclusion of an agency proceeding.)

Second, when Landis wrote the 1934 Act, Congress had not yet enacted the Administrative Procedure Act ("APA"). It enacted the latter in 1946. Thus, when Landis wrote the 1934 Act, its review provision provided the *only* statutory mechanism to seek judicial view of "an order issued by the Commission," whereas today targets like Cochran can ignore § 78y and rely instead on the APA for a cause of action, *see Cochran v. SEC*, No. 19-cv-66-A, Doc. 1, at 20–21 (N.D. Tex. Jan. 18, 2019) (APA claims in Cochran's complaint). So Landis could limit judicial review of the SEC's work simply by failing to authorize it in the 1934 Act, whereas today the SEC must make the much harder showing

channels, he didn't capture everything. To the contrary, § 78y draws a bright line between *pre*-final order and *post*-final order review: Those who are "aggrieved by a final order" and seek "review of the order" fall within § 78y's purview. *Ibid.* Those who aren't and don't, don't.

The Supreme Court's analysis in *Free Enterprise* tracks the distinction in § 78y's text. Some parties are aggrieved by a final order, and "[o]nce the Commission has acted, aggrieved parties may challenge 'a final order of the Commission' or 'a rule of the Commission' in a court of appeals under § 78y." *Free Enterprise*, 561 U.S. at 489. But some parties have claims outside the scope of § 78y, because the SEC and PCAOB can take actions that are *not* "encapsulated in a final Commission order or rule." *Id.* at 490. "[T]he text [of § 78y] does not expressly limit the jurisdiction that other statutes confer on district courts. Nor does it do so implicitly." *Id.* at 489 (citation omitted). Thus, parties with claims not covered by § 78y—that is, parties aggrieved by SEC action other than a final order or rule—are free to invoke other jurisdictional statutes to get their claims into federal court.

The SEC and the dissent attempt to redraw the line created by § 78y and *Free Enterprise*. They would prefer an implicit dotted line precariously positioned between investigation and enforcement. Attempting to justify this line textually, the dissent invokes the principle that "[s]pecification of the one implies exclusion of the other," and argues that "section 78y's grant of jurisdiction to the aggrieved party's local circuit or the D.C. Circuit only after issuance of a final agency order" implies that other courts lack jurisdiction.

---

that a provision originally enacted to *provide* judicial review (however modestly in Landis's day) now operates as an *implicit strip of jurisdiction* over a cause of action that Congress provided elsewhere. *But cf. Abbott Lab'ys*, 387 U.S. at 141 ("The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent.").

No. 19-10396

*Post*, at 72–73 (Costa, J., dissenting) (quotation omitted). But the dissent begs the key question in applying its principle to §78y: Precisely *what* jurisdiction does that statute "specify" as allocated to the courts of appeals, such that other courts are implicitly precluded from exercising it? As just discussed, the statute draws the line at the point when a "final order of the Commission [is] entered" and specifies that a court of appeals has jurisdiction over challenges to that final order. 15 U.S.C. § 78y(a)(1). So, following the principle that "specification of the one implies exclusion of the other," district court jurisdiction over such a challenge to the final order is precluded. And that is the majority's position in this case. The dissent claims it is merely applying a venerable interpretive principle, but its argument really hinges on its unjustified decision to draw a line between investigation and enforcement. That line, unlike the majority's final/non-final line, is unsupported by the statute's text.

2.

One might think that if the investigation-enforcement distinction lacks a textual basis, perhaps it's nonetheless a practical tool that neatly tracks two dichotomous sets of on-the-ground SEC activities. Again, wrong. Investigation and enforcement are two stages of the same administrative process, conducted by the same division of the SEC. And it makes little practical sense to draw a neat legal line between them, because the SEC blends the two activities in a variety of ways, and even conducts both simultaneously.

Investigation and enforcement are both carried out by the SEC's "Enforcement Division," which is the division that "[1] recommend[s] the commencement of investigations of securities laws violations, [2] recommend[s] that the Commission bring civil actions in federal court or before an administrative law judge, *and* [3] prosecut[es] these cases on behalf

of the Commission." Sec. & Exch. Comm'n, *How Investigations Work* (Jan. 27, 2017), https://perma.cc/VX42-USC3 (emphasis added). The process begins when the SEC's "official curiosity" is aroused, perhaps after a review of periodic filings or a complaint by a competitor or whistleblower. Marc J. Fagel et al., *SEC Investigations and Enforcement Actions*, *in* Securities Litigation: A Practitioner's Guide 14-4 (Robert F. Serio et al. eds., 2018). Enforcement Division staff might open a "Matter Under Inquiry" ("MUI") and ask the target or other witnesses to provide documents or give testimony voluntarily. From the SEC's perspective, "[t]he threshold determination for opening a new MUI is low" because of the SEC's incomplete information and desire for additional facts. Sec. & Exch. Comm'n Div. of Enf't, Enforcement Manual 13 (2017), https://perma.cc/WQ7R-QPYK.

If the SEC is not satisfied with the information it can procure voluntarily, it might turn to more formal and coercive investigative tools. The Director of the Enforcement Division can issue a "Formal Order of Investigation," delegating the SEC's statutory authority to subpoena documents and testimony, *see* 15 U.S.C. §§ 77s(c), 78u(b), to specific staff. *See* 17 C.F.R. § 200.30–4(a)(1); Enforcement Manual, *supra*, at 17. These staff are then "empowered to administer oaths and affirmations, subp[o]ena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other records" deemed "relevant or material to the inquiry." 15 U.S.C. § 78u(b). After issuance of the formal order, staff may begin to subpoena documents and testimony from the target and third parties. This process "often last[s] months or even years." Sec. & Exch. Comm'n, *Investor Bulletin: SEC Investigations* (Oct. 22, 2014), https://perma.cc/9688-Q3XY. And none of it is public unless the SEC orders otherwise. 17 C.F.R. § 203.5.

No. 19-10396

At some point during the investigation, if staff decide that an administrative proceeding should be brought against the target, the "Wells Process" begins.[6] At this point, the matter looks a lot like litigation, even though it has not yet reached the "enforcement" side of the dissent's investigation-enforcement line. Staff members send a notice to the target; this notice discloses the claims the staff have preliminarily determined to pursue and summarizes the basis for those claims. *See* ENFORCEMENT MANUAL, *supra*, at 19–20. The target is invited to respond with a Wells submission—"essentially a brief setting forth factual, legal, and policy arguments why an enforcement action is not appropriate (or at least why certain charges or remedies are unwarranted)." Fagel et al., *supra*, at 14-14. The target is also often permitted to meet with Enforcement Division staff and view non-privileged portions of the investigative file. *See* ENFORCEMENT MANUAL, *supra*, at 22. Sometimes this process facilitates settlement between the target and the SEC, or—much less often—persuades the SEC not to press its claims after all. But if the results of the Wells Process do not satisfy the SEC staff, they may formally recommend that the Commission bring an administrative action against the target. If the Commissioners approve the recommendation, the Enforcement Division will file an "order instituting proceedings," at which point an ALJ is selected as the hearing officer and the administrative adjudication officially begins. *See* 17 C.F.R. § 201.200(a)–(b).

But the investigation does not necessarily stop when the enforcement starts. Staff may continue to issue investigatory subpoenas "under the same investigation file number or pursuant to the same [Formal Order of

---

[6] The SEC has discretion to dispense with the Wells Process. But it conducts the process "[i]n virtually every case other than those requiring emergency relief." Fagel et al., *supra*, at 14-14.

Investigation] under which the investigation leading to the institution of proceedings was conducted," as long as the hearing officer is promptly informed of the subpoenas and the subpoenas are "not for the purpose of obtaining evidence relevant to the proceedings." *Id.* § 201.230(g). And if the continuing investigation happens to yield relevant evidence, there's no bar on using it in the ongoing enforcement proceeding. *See ibid.* (only requiring that such evidence be "made available to each respondent for inspection and copying on a timely basis").

Meanwhile, the ALJ—like the SEC staff who just investigated and might still be investigating—may explore the facts by issuing subpoenas, administering oaths and hearing testimony, and receiving relevant evidence from both sides. *Id.* § 201.111(a)–(c). After the ALJ conducts the hearing, the ALJ prepares an initial decision. *Id.* § 201.111(i). If the defendant loses, they may appeal to the full Commission—the same body that already approved the Enforcement Division's recommendation to bring an administrative action against them.

Only after the full Commission considers the appeal and issues a final decision may the defendant use § 78y to get review in a federal court of appeals. But most defendants don't make it to federal court following this path, because first they'd have to wade through the SEC's lengthy investigation-and-enforcement amalgam. *See* Gideon Mark, *SEC and CFTC Administrative Proceedings*, 19 U. Pa. J. Const. L. 45, 57 (2016) (stating that "during the period 2002-2014 the SEC's settlement rate remained constant at about 98%"). Given how little the investigation-enforcement line matters to the SEC, it's unclear why it matters so much to the dissent.

3.

Not only is the dissent's investigation-enforcement line atextual and artificial, it's also illogical. The dissent suggests that respondents in

enforcement proceedings do not face the same catch-22 that the *Free Enterprise* petitioners faced as subjects of mere investigation. *See post*, at 87–89 (Costa, J., dissenting); *see also Bebo v. SEC*, 799 F.3d 765, 774–75 (7th Cir. 2015). In other words, the dissent thinks Cochran doesn't face the intolerable requirement that she "bet the farm" to "test[] the validity of the law," *see Free Enterprise*, 561 U.S. at 490, because she is already in an enforcement proceeding and therefore the proverbial "farm" is already bet.

Wrong again. Throughout the *entire* administrative process—regardless of whether enforcement has begun—the target must choose whether to settle or bet the farm. And the SEC places substantial pressure on targets to choose the former. *See* Jay Clayton, *Statement Regarding Offers of Settlement* (July 3, 2019), https://perma.cc/MTZ9-5HEE (praising the "demonstrated willingness of the Commission to litigate zealously if a timely and reasonable offer of settlement is not made"); Urska Velikonja, *Are the SEC's Administrative Law Judges Biased? An Empirical Investigation*, 92 Wash. L. Rev. 315, 364–65 (2017) (noting that enforcement-proceeding defendants' "willingness to settle may be affected by their perception that ALJs  are less fair" and that "[t]he SEC has reportedly threatened investigated parties with litigation before ALJs if they are unwilling to settle"). In addition to such "sticks," the SEC also uses powerful "carrots" to coerce settlements. For example, the Commission will settle on a "neither admit nor deny" basis that allows defendants to avoid admitting liability; it will also waive important collateral consequences—like the loss of well-known seasoned issuer status—that would otherwise follow from an unfavorable result in enforcement proceedings. *See* Fagel et al., *supra*, at 14–17. Given these carrots and sticks, "choosing to litigate is, in fact, equivalent to 'betting the farm.'" *Tilton v. SEC*, 824 F.3d 276, 298 n.5 (2d Cir. 2016) (Droney, J., dissenting).

Of course, one cost of settlement is that a defendant gives up her right to challenge the SEC in court. So the tremendous pressure to settle with the SEC bears primary responsibility for the "you-must-bet-the-farm-to-get-your-day-in-court" dynamic that the Court found objectionable in *Free Enterprise*. *See* 561 U.S. at 490. And that pressure persists throughout investigation *and* enforcement. Indeed, the pressure is likely greatest after the SEC converts the investigation into a full-fledged enforcement proceeding. Barring access to the district court at this point—without a textual warrant for doing so—is untenable.

The investigation-enforcement distinction also illogically precludes Cochran's claim as soon as it ripens. Cochran claims that the ALJ presiding over her administrative adjudication was unconstitutionally protected from removal. Before the SEC's order instituting proceedings, no ALJ had been assigned to or involved in her case, so any challenge to the removal protections of SEC ALJs would have been unripe. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967) (ripeness requires that the effects of the challenged policy be "felt in a concrete way by the challenging parties"). As soon as the SEC issued its order instituting proceedings and assigned an ALJ to Cochran's case, her claim ripened because that's when an official with an alleged constitutional defect started presiding over her case. But under the dissent's dichotomy, that was also the exact moment her claim disappeared. And her claim would remain illusory, under the dissent's view, until well after the ALJ in question is finished with the case, at which point the claim would suddenly reappear and could be asserted in a federal court of appeals. Thus, according to the dissent, a removal-power claim can be justiciable during an SEC investigation (*e.g.*, *Free Enterprise*); ripen and then immediately disappear when the SEC commences an enforcement proceeding (*e.g.*, this case); and reappear again after the SEC concludes its

enforcement proceeding (*e.g.*, *Jarkesy*, *see post*, at 82 (Costa, J., dissenting)). This peekaboo approach to constitutional claims makes very little sense.

The dissent nonetheless asserts that allowing Cochran to seek review when her claim ripens would allow a novel and disruptive form of "midenforcement review." *Post*, at 72, 85 n.12 (Costa, J., dissenting). This characterization distorts both the law and the facts. First, the law: The door to judicial review remains open under 28 U.S.C. § 1331 unless another statute closes it. *See Free Enterprise*, 561 U.S. at 489. So if no statute precludes review, courts may consider a removal claim while the agency continues working, as *Free Enterprise* itself demonstrates. *See id.* at 487 (reviewing a challenge brought after PCAOB opened a formal investigation but before that investigation concluded); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994) (explaining when judicial review is available and citing cases where an ongoing administrative proceeding did not preclude review). Moreover, what the dissent maligns as "midenforcement review" is simply another form of interlocutory review. And federal courts routinely entertain applications for interlocutory relief in numerous contexts—without causing dysfunction in the judicial system. *See, e.g.*, *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (collateral-order doctrine); *Johnson v. Jones*, 515 U.S. 304 (1995) (qualified immunity); Fed. R. App. P. 8 (stay motions); Fed. R. Civ. P. 23(f) (class certification); 28 U.S.C. § 1292 (interlocutory decisions); *id.* § 1651(a) (mandamus).

Second, the facts: Cochran did not wait until the "middle" of her enforcement proceedings to seek judicial review. Rather, once her case was reassigned to a new ALJ following *Lucia*, she presented her claims by motion to the ALJ and then filed this action—*before* the ALJ had scheduled a hearing or the SEC had taken any substantial steps to prosecute her case before the new ALJ. If some other enforcement target in some future case actually waits until the middle of an enforcement proceeding before raising a constitutional

claim, then a federal court could and should consider that fact in deciding whether the balance of equities favors a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). That's precisely what we do in other interlocutory contexts. *See, e.g.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (exercising interlocutory review over denial of injunction and affirming because "unnecessary, years-long delay in asking for preliminary injunctive relief weighed against [plaintiffs'] request"). Indeed, even under the collateral-order doctrine—where the standards for appealability are far from clear-cut, *see Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 173 (5th Cir. 2009)—we police such jurisdictional lines on an almost daily basis. The dissent offers no reason to think that we'll be less able to weed out abusive SEC petitioners using *Thunder Basin* and *Nken* than we're able to weed out, say, abusive qualified-immunity appellants under *Johnson v. Jones* or abusive civil litigants who want to stretch the *Cohen* requirements to appeal routine discovery orders.

In sum, the dissent would bar Cochran from bringing her claim at the most natural time to adjudicate it—once she begins to concretely suffer harm from the allegedly unconstitutionally insulated ALJ. And would do so by relying on an investigation-enforcement distinction that has no basis in the text of § 78y, makes no practical sense in light of the SEC's enforcement procedures, and is illogical. Once the investigation-enforcement distinction is rejected as atextual, artificial, and illogical, *Free Enterprise* plainly controls and gives Cochran the opportunity to bring her claim in district court.

B.

The dissent is quite right that our court is the first to apply *Free Enterprise* to investigative and enforcement proceedings alike. But in addition to faithfully applying that materially indistinguishable opinion, our approach aligns with other Supreme Court precedent. When faced with a judicial

review provision like that in § 78y, courts use three "*Thunder Basin* factors" to determine whether a plaintiff's specific "claims are of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212. These factors are (1) whether "a finding of preclusion could foreclose all meaningful judicial review"; (2) whether the claims are "'wholly "collateral"' to a statute's review provisions"; and (3) whether the claims are "outside the agency's expertise." *Id.* at 212–13 (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)). All three factors support Cochran's right to pursue her removability claim in district court, as the majority opinion explains. But two Supreme Court cases decided just this year further solidify this conclusion and undermine the dissent's contrary position.

1.

Begin with the "meaningful judicial review" factor. If funneling a particular claim through the statutory review mechanism will deny a plaintiff meaningful judicial review of that claim, that suggests the statute did not implicitly preclude district court jurisdiction over the claim. Applying this factor to Cochran's claim, the key case is *Collins v. Yellen*, 141 S. Ct. 1761 (2021).

Like Cochran, the petitioners in *Collins* claimed that agency officials who had made decisions that harmed them were unconstitutionally protected from removal. The Supreme Court agreed with the petitioners that certain removability protections were unconstitutional. But "[a]ll the officers [in question] were properly *appointed*," so the Court found that their actions were not automatically rendered void by virtue of the unconstitutional removal protections. *Id.* at 1787. Thus, because *Collins* was a *removability* case, the Supreme Court did not grant the same remedy that it had previously granted in unconstitutional *appointment* cases—namely, the right to a new hearing before a new ALJ after the constitutional defect was cured. *E.g.*, *Lucia*

*v. SEC*, 138 S. Ct. 2044, 2055 (2018) (concluding that petitioner was entitled to a new hearing before a properly appointed official). The Court chose to remand the remedy question, but it did suggest that winning retrospective relief in removability cases requires a showing of harm specifically attributable to the unconstitutional removal protection. For example, retrospective relief would be available if "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way." *Collins*, 141 S. Ct. at 1789.

This suggestion indicates that it will be very challenging to obtain meaningful retrospective relief for constitutional removability claims after *Collins*. Winning the merits of the constitutional challenge will not be enough, as it has been in appointment cases like *Lucia*. Challengers will also need to identify a retroactively vindicable harm inflicted by the unconstitutional removal protection. It is unclear how often challengers will be able to do this—the examples hypothesized by the *Collins* Court, like a public statement that an officer would have been removed but for a removal protection, are quite uncommon occurrences. Thus, challengers with meritorious removability claims may often be left without any remedy if they are forced to wait until after enforcement proceedings conclude and bring their claims through § 78y.

The "meaningful judicial review" factor thus requires an alternative path to court for targets of SEC enforcement proceedings. A person subject to an unconstitutional adjudication should at least be able to sue for declaratory relief requiring a constitutionally structured proceeding. *Cf. Free Enterprise*, 561 U.S. at 513 (finding petitioners "entitled to declaratory relief sufficient to ensure that the . . . standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive"). After *Collins*, this may be the only way to provide a "'meaningful' avenue of

No. 19-10396

relief" for claims like Cochran's and check the agency's Landisonian tendency toward exclusive, unimpeded control over the way it investigates and proceeds against its targets. *Free Enterprise*, 561 U.S. at 491 (quoting *Thunder Basin*, 510 U.S. at 212).

2.

Consider the final two *Thunder Basin* factors: whether the claims are "wholly collateral" to a statute's review provisions, and whether they are "outside the agency's expertise." 510 U.S. at 212 (quotation omitted). The key case here is *Carr v. Saul*, 141 S. Ct. 1352 (2021).

In *Carr*, disability claimants before the Social Security Administration whose claims had been rejected by the Administration's ALJs argued that the ALJs had not been validly appointed under the Appointments Clause. The Administration responded that the claimants had forfeited this argument by failing to raise it before the agency. The Supreme Court rejected the Administration's position, holding that an issue-exhaustion requirement should not be imposed on the petitioners' Appointments Clause claims. This holding rested on a finding that "adversarial development" of the petitioners' structural constitutional claim "simply did not exist" in the ALJ proceedings. *Id.* at 1362 (quoting *Sims v. Apfel*, 530 U.S. 103, 112 (2000)). This finding suggests that structural constitutional challenges often cannot be meaningfully aired in administrative proceedings. And that supports the conclusion that they are "wholly collateral" to those proceedings.[7]

---

[7] Unlike the disability claimants in *Carr*, who could not have made their constitutional claims to the SSA Commissioner before judicial review, *see Carr*, 141 S. Ct. at 1361, the SEC's administrative review scheme would allow Cochran to make her claim to the SEC Commissioners before § 78y came into play. But as in *Carr*, the SEC has provided no indication that its administrative proceedings could or would yield any meaningful adversarial development of Cochran's structural constitutional claim.

The *Carr* Court also repeatedly observed that structural constitutional challenges are outside the expertise of agency ALJs. *See id.* at 1360 ("[A]gency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise."); *id.* at 1361 ("Petitioners assert purely constitutional claims about which SSA ALJs have no special expertise."). These statements should erase any doubt that the "agency expertise" factor supports Cochran.

The dissent resists this conclusion by arguing that we should consider whether the ALJ has expertise regarding the "overall case," not the specific claim Cochran wants to bring in district court. *Post*, at 90 (Costa, J., dissenting). This is appropriate, the argument goes, because the ALJ's expertise-guided ruling on other issues might moot Cochran's constitutional claim. This approach has several problems. For one, it stacks the deck against judicial review, such that the "agency expertise" factor will *always* favor the agency—because agency enforcement proceedings, considered in their entirety, always relate to the agency's area of expertise. Second, it is flatly inconsistent with *Thunder Basin*'s focus on whether "*claims* . . . [are] outside the agency's expertise," not whether *cases* are. 510 U.S. at 212. Finally, it rests on an overreading of *Elgin v. Department of Treasury*, where the Court noted that in the particular dispute in that case, the agency might use statutory interpretation to alleviate the petitioners' constitutional concerns. 567 U.S. 1, 23 (2012). *Elgin* did not purport to transform the *Thunder Basin* test from a claim-focused inquiry to a case-focused inquiry. And *Carr* establishes beyond any doubt that Cochran's *claim* is outside the expertise of the SEC.

## C.

Efficiency was James Landis's biggest worry. He called it "the desperate need" of government. Landis, *supra*, at 24. The administrative

state was the only way that "tripartite political theory" could respond to "the demand that government . . . provide for the efficient functioning of the economic processes of the state." *Id.* at 16. And the end of efficiency was best served by moving as many functions as possible—legislative, executive, and judicial—to administrative agencies. Judicial functions in particular were best handled by administrative agencies, because "the judicial process" struggled "to make the necessary adjustments in the development of both law and regulatory methods" to promote efficient industry and governance. *Id.* at 30. In this case, the dissent agrees that administrative rather than judicial review is the more efficient course. *Post*, at 93–95 (Costa, J., dissenting). But there are at least three problems with that.

First and most importantly, when Congress vests a district court with jurisdiction, it's obliged to exercise it—efficiencies aside. Long before Landis lodged his objections, Chief Justice Marshall affirmed that federal courts must take cases within their jurisdiction: "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). By now it is well established that, with exceptions not relevant here, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). The "efficiency" of exercising jurisdiction is irrelevant. If you have it, you exercise it; if you don't, you don't.

Second, even if efficiency mattered, the exercise of jurisdiction would be no more inefficient in Cochran's case than in *Free Enterprise*, where the Supreme Court held that § 78y did not strip district court jurisdiction during ongoing investigative proceedings. The dissent identifies four inefficiencies that may result from "allowing immediate judicial resolution" of Cochran's claim: (1) "three courts w[ill] have devoted time to the agency matter" by the time it concludes; (2) "a respondent will get two bites at a cert petition";

(3) "[m]ultiple layers of unsuccessful pre-enforcement judicial review will be costly to the parties and courts while substantially delaying the agency proceeding"; and (4) "allowing judicial review both before and after an agency adjudication risks review of the same matter in different circuits." *Post*, at 93 (Costa, J., dissenting). But the same inefficiencies were at stake in *Free Enterprise*, because allowing the target of an investigation to bring a pre-enforcement challenge in federal court created the same risks of delay and duplicative litigation. Yet the Court didn't waver, suggesting that these concerns should carry little weight in implicit preclusion analysis. Besides, the dissent's fears of obstruction and delay are likely overblown, because district courts will enjoin agency proceedings only if they conclude that a plaintiff's constitutional claims are likely to succeed on the merits. The *Free Enterprise* litigation itself is an example of this. *See Free Enter. Fund v. PCAOB*, No. 06-0217, 2007 WL 891675, at *2, *6 (D.D.C. Mar. 21, 2007) (denying plaintiffs' request for "an order enjoining the Board from taking any further action against [them]"). This screening mechanism decreases the risk that a party will delay agency action with "weak" constitutional claims, while allowing parties with meritorious claims to avoid the ongoing injury of an unconstitutional proceeding.

Third and finally, allowing Cochran to raise her removal-power challenge at the beginning of her enforcement proceeding may prove *more* efficient than requiring her to first wade through the potentially unconstitutional review process. To see why, consider the case of Raymond Lucia—a case the dissent cites for the proposition that Cochran could get meaningful post-enforcement review of her constitutional claim. *Post*, at 81 (Costa, J., dissenting). Lucia, using § 78y, prevailed in the Supreme Court after years of SEC enforcement proceedings and appellate review. The Court agreed with Lucia that the SEC ALJ who adjudicated his enforcement proceedings "heard and decided Lucia's case without the kind of

appointment the Clause requires." *Lucia*, 138 S. Ct. at 2055. So, the Court said, Lucia was entitled to a new hearing before a new, properly appointed ALJ. *Ibid.* The SEC did re-initiate enforcement proceedings before a new, properly *appointed* ALJ. *See Lucia v. SEC*, U.S. Dist. LEXIS 143906, at *4 (S.D. Cal. Aug. 21, 2019). But because the Supreme Court chose not to address his removal-power challenge, *see Lucia*, 138 S. Ct. at 2050 n.1., Lucia was still proceeding before an ALJ he contended was constitutionally illegitimate, *Lucia*, U.S. Dist. LEXIS 143906, at *5. Lucia raised this challenge before a district court, which ruled that he must await *another* SEC final order before pursuing this constitutional claim. *See id.* at *8. Lucia appealed, but the Ninth Circuit refused to stay his case pending appeal. *Lucia v. SEC*, 2020 U.S. App. LEXIS 2228 (9th Cir. Jan. 23, 2020). At that point, Lucia had had enough; like many others in this situation, he settled after eight years of administrative proceedings and federal court litigation—thus sacrificing the constitutional claim that Cochran now must press instead. *See* Raymond J. Lucia Cos., Inc., Exchange Act Release No. 33895, 2020 WL 3264213 (June 16, 2020). So much for efficiency.

*    *    *

Woodrow Wilson asked his fellow statesmen to worry less about the *constitution* of government and more about its *administration*. The SEC asks the same of us today: Let us get on with administration, and you can worry about how our administrative proceedings are constituted another time. The majority is right to reject this argument. Under 28 U.S.C. § 1331 and relevant Supreme Court precedent, Michelle Cochran has the right to ask that her administrative proceeding conform to constitutional requirements. She's entitled to her day in court. And that day is today.

No. 19-10396

Gregg Costa, *Circuit Judge*, dissenting, joined by Owen, *Chief Judge*, and Stewart, Dennis, Southwick, Graves, and Higginson, *Circuit Judges*:

This appeal is not about whether Michelle Cochran will have the opportunity to press her separation-of-powers claim—she will.  It instead asks: Where and when?

Before today, every court of appeals to consider the question has answered that a person facing an SEC enforcement action may not mount a collateral attack against the agency proceeding in federal district court. *Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016); *Hill v. SEC*, 825 F.3d 1236 (11th Cir. 2016); *Tilton v. SEC*,  824 F.3d 276 (2d Cir. 2016); *Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015); *Bebo v. SEC*, 799 F.3d 765 (7th Cir. 2015); *see also Axon Enter., Inc. v. FTC*, 986 F.3d 1173 (9th Cir. 2021) (holding same for similar FTC judicial review provision).  Now, for the first time in the 80-plus year history of the SEC,[1] an appellate court is allowing that district court intervention.[2]  The majority's new path contravenes a statutory scheme that

---

[1] During the infancy of the SEC, the Second Circuit recognized the exclusivity of section 78y's review scheme. *See SEC v. Andrews*, 88 F.2d 441 (1937).  In an opinion joined by Judge Learned Hand, the court explained "[i]t is perfectly clear that a suit against the Commission, an administrative agency of the United States, can be maintained only in the courts and upon the terms specified in the statute." *Id*. at 441.  A defendant facing an SEC suit in district court thus could not assert a counterclaim challenging a separate agency administrative action because section 78y "provides how and where a person aggrieved by an order of the Commission may obtain judicial review of such order." *Id*. at 441–42.  Any judicial review, the court further explained, "could only be had in a Circuit Court of Appeals." *Id*. at 442.

[2] Grasping to find some toehold to justify its screed on the administrative state, the concurring opinion misreads the above sentence.  Concurring Op. 31 (alleging that the dissent considers 'the 80-plus year history of the SEC'").  The sentence does not refer to what the SEC has done during its 80-plus years, but to what courts have done during that time when confronted with efforts like Cochran's to collaterally attack agency proceedings in district court.  The point is that an unbroken chain of decisions starting with *Andrews* in

No. 19-10396

"allocate[s] initial review to an administrative body." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). It invents a new category of midenforcement review to go along with traditional pre- and postenforcement review. In doing so, it multiplies the number of court proceedings arising out of an SEC enforcement action and allows the anomaly of different courts of appeals' reviewing the same agency proceeding. Worst of all, it turns constitutional avoidance on its head by making separation-of-powers claims a first rather than last resort in resolving cases.

## I.

We are supposed to be chary—not champing at the bit—to create circuit splits. *Alfaro v. Comm'r of Internal Revenue*, 349 F.3d 225, 229 (5th Cir. 2003). The majority's discounting the wisdom of our brethren is especially pronounced when it comes to the first question this case poses: whether it is "fairly discernible" from the SEC enforcement scheme "that Congress precluded district court jurisdiction" over suits challenging an agency proceeding. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012) (first quotation from *Thunder Basin*, 510 U.S. at 207). Five circuits have considered the question. By a count of 15-0, every judge deciding those cases has answered that the "securities laws' scheme of Commission adjudication and ensuing judicial review" in an appellate court divests district courts of jurisdiction in the "mine-run of cases."[3] *Jarkesy*, 803 F.3d at 16; *accord*

---

1937 through five circuits' post-*Free Enterprise* decisions had rejected district court intervention in SEC proceedings.

[3] It is also notable that *Free Enterprise Fund v. Public Company Accounting Oversight Board*, in recognizing district court jurisdiction, does not disagree that section 78y, as a general matter, provides the exclusive means for judicial review of SEC proceedings. 561 U.S. 477, 489–90 (2010). In fact, it recognized that "[g]enerally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular

*Bennett*, 844 F.3d at 181–83; *Hill*, 825 F.3d at 1242–45; *Tilton*, 824 F.3d at 281–82;[4] *Bebo*, 799 F.3d at 775.

A distinguished D.C. Circuit panel explained why it was not "seriously dispute[d] that Congress meant to channel most challenges to the Commission's administrative proceedings through the statutory review scheme." *Jarkesy*, 803 F.3d at 17 (Srinivasan, J., joined by Judges Kavanaugh and Randolph); *see also Tilton*, 824 F.3d at 282 (noting the plaintiffs did not even contest this issue). The language and structure of the SEC judicial review statute are "nearly identical" to those of the Mine Safety Act, which the Supreme Court recognized "implicitly barred" district court jurisdiction over pre-enforcement challenges. *Jarkesy*, 803 F.3d at 16 (citing *Thunder Basin*, 510 U.S. at 207–08; 30 U.S.C. § 816(a)(1)).

Starting with the text, section 78y's grant of jurisdiction to the aggrieved party's local circuit or the D.C. Circuit only after issuance of a final agency order channels review through that scheme. *See Jarkesy*, 803 F.3d at 16; *see also Free Enter.*, 561 U.S. at 489 ("Generally, when Congress creates

---

problems,' those procedures 'are to be exclusive.'" *Id*. at 489 (quoting *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 420 (1965)). *Free Enterprise Fund* found district court jurisdiction only after proceeding to the three *Thunder Basin* factors, under which certain types of claims may fall outside an implicit limit on district court jurisdiction. *Id*. at 489–90. That analysis would have been unnecessary if, as the majority surmises, section 78y does not generally create an exclusive avenue for review of SEC proceedings.

[4] In *Tilton*, Judge Droney dissented on a different ground. 824 F.3d at 292–99 (Droney, J., dissenting). In applying the *Thunder Basin* factors at the second stage of the inquiry, he concluded that a separation-of-powers claim is not the type that Congress meant to exclude in crafting an otherwise exclusive scheme of agency adjudication followed by review in an appellate court. *See id*. But he did not dissent from the Second Circuit's conclusion that "[g]enerally . . . persons responding to SEC enforcement actions are precluded from initiating lawsuits in federal courts as a means to defend against them." *Id*. at 282 (citation omitted).

procedures 'designed to permit agency expertise to be brought to bear on particular problems,' those procedures 'are to be exclusive.'" (quoting *Whitney Nat. Bank*, 379 U.S. at 420)); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) ("[S]pecification of the one implies exclusion of the other. . . ."). Indeed, the statute emphasizes that once the agency's jurisdiction over the case ends, the court of appeals has "exclusive" jurisdiction "to affirm or modify and enforce or to set aside the order in whole or in part." 15 U.S.C. § 78y(a)(3); *Jarkesy*, 803 F.3d at 16. Other provisions set forth exhaustion requirements, the standard of review the court of appeals is to follow, and the process for remanding to "adduce additional evidence." 15 U.S.C. §§ 78y(c)(1); (a)(4); (a)(5); *see also Jarkesy*, 803 F.3d at 16–17. These rules would have little force if a party could evade them by seeking review in a district court. *Elgin*, 567 U.S. at 11–12 (recognizing that when a statute sets forth a review scheme in "painstaking detail," it follows that "Congress intended to deny . . . an additional avenue for relief in district court").

The structure of the SEC enforcement scheme provides further evidence that section 78y creates an exclusive review scheme that bypasses district courts. The SEC has three options when pursuing a case. The Commission may adjudicate the case itself, pursue charges before an ALJ, or file suit in district court. 15 U.S.C. §§ 78u(d), 78u-2, 78u-3. The agency's statutory power to select the forum would be illusory if defendants could file an action in district court. *Jarkesy,* 803 F.3d at 17; *Tilton*, 824 F.3d at 282 n.3. And the provision authorizing the SEC to seek injunctive relief in district courts, 15 U.S.C. § 78u(d)(1), would be unnecessary if district courts retained residual federal question jurisdiction over SEC matters. *See Thunder Basin*, 510 U.S. at 209 (citing the fact that the Mine Safety Act allows the Labor Secretary to file in district court in certain situations as a reason why other parties' only recourse was to "complain to the Commission and then

to the court of appeals" (citing 30 U.S.C. §§ 818(a), 820(j))).  The Exchange Act's comprehensive statutory scheme for agency adjudication followed by straightaway review in a court of appeals makes it "fairly discernible that Congress intended to deny . . . an additional avenue of review in district court."  *Elgin*, 567 U.S. at 12.

The majority comes up with three reasons to doubt this straightforward analysis that heretofore enjoyed unanimous circuit support.  First, it points out that section 78y applies only when there is a "final order of the Commission."  Maj. Op. 6 (citing 15 U.S.C. § 78y(a)(1)).  Second, the majority notes that section 78y is permissive, saying that a party "may" seek review in a court of appeals.  Maj. Op. 7.  Third, the majority contends that vesting the courts of appeals with "exclusive jurisdiction" after the agency rules actually means the opposite of what it says—that district courts can entertain collateral attacks on an SEC proceeding.  Maj. Op. 7–8.  No court has ever suggested that these statutory features indicate section 78y does not displace district court jurisdiction (and, as mentioned, courts have drawn the opposite conclusion from some of these features).  That is for good reason— each of these arguments is fatally flawed.

Section 78y does nothing new in requiring final agency action before judicial review.  Of course, the Administrative Procedure Act imposes that requirement for judicial review of agency action.  5 U.S.C. § 704.  Agency-specific judicial review statutes, like the one for the SEC, do the same thing.  *See, e.g.*, 15 U.S.C. § 78y (SEC); 15 U.S.C. § 45(c) (FTC); 29 U.S.C. § 660(a) (OSHRC); 29 U.S.C. § 160(f) (NLRB).  Under the majority's view, because these statutes allow judicial review in courts of appeals only after a final agency order issues, none of them preclude a district court suit against the agency before the enforcement order issues.  That position carries astonishing consequences.  It would, for example, mean that unions and

employers could sue the NLRB in district courts before the agency rules in labor disputes.

We know, however, that the law does not allow pre-enforcement district court suits whenever a judicial review scheme only vests courts of appeals with postenforcement jurisdiction.  After all, that describes the two judicial-review statutes the Supreme Court has read to impliedly preclude district court jurisdiction.  The Mine Act allows review in the courts of appeals of "an order of the Commission issued under this chapter."  30 U.S.C. § 816(a)(1).  The Civil Service Reform Act allows review in the Federal Circuit of "a final order or decision of the Merit Systems Protection Board."  5 U.S.C. §§ 7703(a)(1), (b)(1)(A).  Although these laws allow review in the court of appeals only after the agency rules, the Court held that they displaced district courts' jurisdiction to hear pre-enforcement challenges. *Elgin*, 567 U.S. at 10–13 (holding that Civil Service Reform Act's statutory review scheme precludes district court jurisdiction); *Thunder Basin*, 510 U.S. at 207–09 (same for Mine Act).

More broadly, the majority's theory that a postenforcement judicial-review scheme cannot limit pre-enforcement challenges is at odds with the very concept of implicit jurisdiction stripping.  The premise of implicit preclusion of district court jurisdiction is that an agency enforcement scheme combined with postenforcement judicial review can create "a single review process" in which pre-enforcement judicial challenges "might thwart effective enforcement of the statute."  *Thunder Basin*, 510 U.S. at 211, 212; *id*. at 207 ("In cases involving delayed judicial review of *final agency actions*, we shall find that Congress has allocated initial review to an administrative body where such intent is 'fairly discernible in the statutory scheme.'" (emphasis added) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150,

157 (1970)))). The majority is thus rejecting the Supreme Court's doctrine of implied preclusion rather than applying it.

The majority's second reason for why it believes section 78y does not channel review to postagency appeals—that the statute says that an appeal "may" be brought in the court of appeals—is even weaker. Statutes authorizing review of agency decisions commonly use the permissive "may." *See, e.g.,* 15 U.S.C. § 78y (SEC); 15 U.S.C. § 45(c) (FTC); 16 U.S.C. § 825l(b) (FERC); 29 U.S.C. § 660(a) (OSHRC); 29 U.S.C. § 160(f) (NLRB) (all stating that a party aggrieved by an agency order *may* appeal). The reason should be obvious: a losing party is under no obligation to bring an appeal; the party has a choice. This supposedly defective feature of the SEC statute again exists in the judicial review provisions of the Mine Act and Civil Service Reform Act, which the Supreme Court held strip district courts of jurisdiction. 30 U.S.C. § 816(a)(1) (Mine Act) (stating that party "aggrieved by an order of the Commission issued under this chapter *may* obtain a review of such order" in a court of appeals (emphasis added)); 5 U.S.C. § 7703(a)(1) (Civil Service Reform Act) (stating that employee "aggrieved by final order or decision of the Merit Systems Protection Board *may* obtain judicial review of the order or decision" (emphasis added)). The majority's view— that inclusion of "may" in a review scheme means other avenues of review remain open—thus wipes away *Elgin* and *Thunder Basin*.

The majority's third argument is a curious one. It theorizes that in stating that a court of appeals' jurisdiction "becomes exclusive on the filing of the record," the statute somehow means district courts have jurisdiction before that point. Maj. Op. 8 (citing 15 U.S.C. § 78y(a)(3)). We are getting into broken-record territory here, but yet again the majority is saying *Thunder Basin* is wrong. That is because the Mine Safety Act says the same thing as the Exchange Act: "Upon such filing [of the agency record], the court shall have exclusive jurisdiction of the proceeding . . . ." 30 U.S.C. § 816(a)(1).

No. 19-10396

The Supreme Court cited that exclusivity language as evidence that the statute precludes district court jurisdiction.  510 U.S. at 208 (citing 30 U.S.C. § 816(a)(1)).  The reason a court of appeals' jurisdiction becomes exclusive on the filing of the agency record should be apparent: that is when the agency loses jurisdiction.  The "exclusive" language is discussing the jurisdiction of the court of appeals vis-à-vis the agency, not the district court.[5] The majority is only thinking of the review scheme in terms of courts.  But section 78y creates a "single review process"—agency adjudication followed by review in the court of appeals—and nothing in the statute indicates that district courts can inject themselves into that streamlined path.  Certainly there is no support for that position in the statute's providing that a court of appeals' jurisdiction becomes exclusive once it receives the agency record. Instead, that exclusivity language reinforces that the statute creates a single avenue for review that begins when the agency initiates the enforcement action and ends after the court of appeals or Supreme Court rules.  *See Jarkesy,* 803 F.3d at 16 (recognizing that granting the court of appeals' "exclusive jurisdiction" to set aside the agency order shows an intent to preclude district court jurisdiction).

Beyond these problems with the three novel reasons it identifies for the view that section 78y does not forbid district court jurisdiction, the majority's analysis of this first step of the preclusion analysis suffers from a more general analytical misstep.  In determining "whether it is 'fairly discernible' that Congress precluded district court jurisdiction over petitioners' claims, we examine [the statute's] text, structure, and purpose."

---

[5] The corresponding FTC statute shows that these types of provisions are talking about jurisdiction between the agency and the court of appeals, not between trial and appellate courts.  It provides that after a party files a notice of appeal, the agency and court of appeals enjoy "concurrent" jurisdiction, meaning the agency can still modify orders "until the filing of the record."  15 U.S.C. § 45(c).

*Elgin*, 567 U.S. at 10 (citation omitted). Nowhere in this inquiry is the focus on the type of claim a party is seeking to bring in district court. In contrast, the type of claim matters at the second inquiry—application of the *Thunder Basin* factors—which is reached only if the statutory review scheme does, as a general matter, preclude district court jurisdiction. If Congress's intent to preclude jurisdiction is fairly discernible, then the second inquiry considers if the claim is "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212; *see Elgin*, 567 U.S. at 15 (rejecting the argument that the constitutional nature of the claim affects the first "fairly discernible" question but then proceeding to determine under the *Thunder Basin* factors if petitioners' "claims are not the type that Congress intended to be reviewed within the CSRA scheme"); *Jarkesy*, 803 F.3d at 17 (recognizing that the "particular challenges" raised by the plaintiff become relevant after the court has found that "Congress meant to channel most challenges to the Commission's administrative proceedings through the statutory review scheme"). The majority thus errs by analyzing the statute-focused first question in the context of Cochran's specific claim. *See* Maj. Op. 6 ("The statute says nothing about people, like Cochran, who have claims that have nothing to do with any final order that the Commission might one day issue."); *id.* at 8 ("Consequently, the text of § 78y does not support the SEC's position with respect to Cochran's removal power claim.").

This first/second step distinction may seem like an academic debate about which doctrinal box to fit various arguments in. But the ramifications are far-reaching of the majority's reasoning that section 78y does not create an exclusive review scheme because it is permissive and applies only to those challenging final orders. It would mean that district courts' federal question jurisdiction under section 1331 applies across the board to claims relating to

No. 19-10396

pending SEC proceedings.[6]  A party facing an agency proceeding can sue in federal district court for any type of claim—be it separation of powers, some other constitutional claim like due process, or even statutory claims like whether an investment vehicle is a "security."  The majority tries to obscure this implication of its ruling with its dubious holding that Cochran forfeited her due process claim in this appeal.[7]  Despite its not remanding the due process claim, the majority's view is hiding in plain sight: A district court's section 1331 jurisdiction remains in full force when a party facing an SEC enforcement action wants to sue the agency for any type of claim.  Maj. Op. 6 (stating that the "text of § 78y conflicts with the SEC's position" that the statute channels jurisdiction to the agency and court of appeals); *id.* at 7 (arguing that "§ 78y(a)(1)'s permissive language" should not be read as "eliminating alternative routes to federal review").[8]  This holding risks

---

[6] The concurring opinion is more explicit about this, stating that the case should be resolved entirely based on the "unambiguous" text of sections 1331 and 78y.  Concurring Op. 30.  It apparently believes we can ignore the Supreme Court's repeated instruction that "[w]hether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review."  *Thunder Basin*, 510 U.S. at 207.

[7] The record says otherwise.  In her original merits brief, Cochran requested a full reversal of the district court's jurisdictional dismissal of her "constitutional claims," and repeatedly addresses the due process claim, *id*. 14, 21, 44-46, 51.  Plus, the district court's ruling was jurisdictional, so forfeiture does not apply.

[8] Later in its opinion, the court says its holding is only that the "Exchange Act divested district court jurisdiction over claims that SEC ALJs are unconstitutionally insulated from the President's removal power; our holding extends no further . . . ."  Maj. Op. 25; *see also* Maj. Op. 8 n.7.  This does not appreciate the implications of reasoning at step one that the Exchange Act evinces no intent to displace district court jurisdiction.  As explained, that is not a claim-specific ruling.  If the merely "permissive" section 78y does not channel challenges to SEC administrative proceedings to the agency and appellate courts, then general federal question jurisdiction is alive and well in this circuit for any collateral attack on any SEC proceeding.

serious disruption of the administrative scheme that the Exchange Act created.

*  *  *

The overarching problem is that the majority analyzes the "discernible intent" question as if it were writing on a blank canvas. But the Supreme Court has already painted the picture. Statutes, with language and structure almost identical to section 28y, that provide for agency adjudication followed by appellate review generally prevent district courts from interfering with enforcement proceedings. Even when the judicial review provision applies only to "final agency action." Even when the judicial review provision says a party "may" appeal. Even when a court of appeals' jurisdiction becomes "exclusive" once the agency record is filed. Even when the statute gives the agency a choice to bring an administrative proceeding or lawsuit. As every circuit judge who has looked at the question before today has concluded, the Exchange Act creates an exclusive review scheme once the Commission brings an administrative proceeding.

## II.

Having had to engage in a far-too-lengthy dive into what should be the easy question in this case, we arrive at the one that has been the focus in other courts: whether the separation-of-powers claim Cochran asserts is of the type that Congress meant to exclude from district court jurisdiction when it created the SEC-specific scheme or agency review followed by direct appeal to a circuit court. We can conclude that Congress did not intend for a claim to go through the statutory review scheme it created only when: (1) administrative proceedings would foreclose all meaningful judicial review; (2) "the suit is wholly collateral to a statute's review provisions"; and (3) the claim is "outside the agency's expertise." *Free Enter.*, 561 U.S. at 489

(internal quotation marks and citation omitted).  Those criteria are not met here.

## A.

Meaningful review is available for Cochran's separation-of-powers claims.  That opportunity exists when a party can raise its claims to a court of appeals following an adverse result before the agency.  *See Elgin*, 567 U.S. at 17; *Thunder Basin*, 510 U.S. at 215.  It is indisputable that such an opportunity exists for separation-of-powers claims brought by parties facing an enforcement action.

Exhibit A is *Lucia v. SEC*, 138 S. Ct. 2044 (2018), the case Cochran relies on to support the merits of her removal-power claim.  Lucia's challenge to the appointment of SEC ALJs did not require deviation from section 78y's review scheme.  That landmark ruling came from a postenforcement appeal that went to the court of appeals and then on the Supreme Court.  *Id.* at 2049–50.  Section 78y's judicial review proved meaningful for Lucia.

Exhibit B is another leading separation-of-powers case, *NLRB v. Noel Canning*, 573 U.S. 513 (2014).  The Pepsi distributor convinced the D.C. Circuit and Supreme Court that recess appointments to the NLRB were unconstitutional after the NLRB ruled that the company had to execute a collective bargaining agreement.  *See id.* at 520–21; 705 F.3d 490 (D.C. Cir. 2013); 358 N.L.R.B. No. 4 (2012).  Judicial review after the agency issued a final order allowed meaningful review of Noel Canning's claim under the Recess Appointment Clause.

Exhibit C is a case the Supreme Court decided earlier this year, *Carr v. Saul*, 141 S. Ct. 1352 (2021).  *Carr* holds that Social Security claimants who lose before an ALJ can raise a separation-of-powers claim during postadjudication judicial review even without exhausting that claim before the agency.  *Id.* at 1356–58, 1362.  If postadjudication review were not

meaningful for this type of claim, the no-exhaustion rule would not make sense. But to allow for a full airing of the petitioner's appointment-power claims, the Supreme Court remanded the two cases to courts of appeals. *Id.* at 1362. Postadjudication judicial review thus proved meaningful for the *Carr* petitioners.

Exhibit D is a case pending on our docket, *Jarkesy v. SEC*, No. 20-61007 (appeal filed Nov. 2, 2020). You may recall the name, as Jarkesy was the person who unsuccessfully tried to file a pre-enforcement suit in federal court in the District of Columbia. *See* 803 F.3d at 9. After the administrative proceeding against Jarkesy ran its course, he filed an appeal in our court. His appeal raises, among other claims, the same removal-power challenge to SEC ALJs that Cochran is pursuing. Brief for Petitioners, *Jarkesy v. SEC*, No. 20-61007, at 55–57. Jarkesy is thus using the section 78y path to obtain meaningful review of his separation-of-powers claim.[9]

The majority cannot deny that parties have been and are raising separation-of-powers claims like Cochran's in postenforcement appeals. Tellingly, it is only able to say that "the Exchange Act's statutory-review scheme *threatens* to deprive Cochran of the opportunity for meaningful judicial review." Maj. Op. 20 (emphasis added). It is not surprising that the majority cites no authority for this "threatens to" standard; its reason for why Cochran's claim may not end up in a court shows that this argument proves too much. The majority explains there is no "guarantee" Cochran will obtain judicial review as she may win before the ALJ. Maj. Op. 21. True enough, but that is also true of other constitutional claims (like due process)

---

[9] Jarkesy's challenging the final order in the Fifth Circuit after earlier suing the SEC in the District of Columbia illustrates the risk of duplicative and inconsistent rulings from different circuits that may result from the majority's allowing pre-enforcement suits in district court. *See infra* p. 20.

as well as statutory claims. Courts will not review those questions if an ALJ rules against the agency. So on the majority's reasoning, statutes allowing postenforcement judicial review will never provide "meaningful review" because a party who prevails before the agency cannot appeal. Yet the Supreme Court has held otherwise, explaining that what matters is the availability of judicial review if the agency respondent loses. *Elgin*, 567 U.S. at 17–18; *Thunder Basin*, 510 U.S. at 215. Undeniably, judicial review is available to Cochran if the ALJ rules against her.

The majority thus has to identify something different about claims alleging that an ALJ enjoys improper removal protection. That difference, it concludes, is that even if Cochran wins before the ALJ, she would have suffered the "injury of having to appear before the SEC."[10] Maj. Op. 21. *But see Jarkesy*, 803 F.3d at 25 (rejecting this argument that a claim can avoid the section 78y review scheme if it involves a harm of "having to undergo a constitutionally deficient proceeding"). But we now know there is a more

---

[10] This would reach beyond separation-of-powers claims. *See Bebo*, 799 F.3d at 775 (noting that "[e]very person hoping to enjoin an ongoing administrative proceeding could make [the] argument" that pre-enforcement review would prevent an unlawful enforcement action). Consider a common dispute in securities cases: whether an investment vehicle is in fact a "security" subject to SEC jurisdiction. *See, e.g., SEC v. Edwards*, 540 U.S. 389 (2004); *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). A party who prevails on that argument in a postenforcement appeal should never have been subject to SEC jurisdiction in the first place. But that statutory claim can be raised in postenforcement appeals, so a district court would not have jurisdiction to consider it.

*Thunder Basin* demonstrates this point. The mine operator sued in district court arguing that the Secretary of Labor was applying a regulation in violation of the National Labor Relations Act. *See* 510 U.S. at 204–06. But the Supreme Court held that the mine had to face the enforcement proceeding and could challenge the Secretary's interpretation in court only after it lost before the agency. *Id.* at 216. If the mine ultimately prevailed in a postenforcement appeal, then it would have endured an unlawful enforcement proceeding. And one that implicates the separation of powers as an agency oversteps its Article II role when it takes action that violates law enacted by Congress. But the mine still had to raise its claim through the review scheme Congress created in the Mine Safety Act.

serious injury when an ALJ was unconstitutionally appointed than when an ALJ enjoys unconstitutional removal protections.   The Supreme Court just told us that while the unlawful appointment of an agency official leads to an "exercise of power that the actor did not lawfully possess," the same is not true for agency officials who are improperly insulated from removal.  *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) (labeling as "neither logical nor supported by precedent" the argument that the actions of an agency official who enjoys unconstitutional removal protection are "void").  It follows that the recent cases recognizing a meaningful opportunity to challenge improper appointment of ALJs in postenforcement appeals, *see Lucia*, 138 S. Ct. 2044; *Carr*, 141 S. Ct. 1352—even though those ALJs had no power to act in the first place—must mean there is also a meaningful opportunity to raise removal claims in postenforcement appeals.

Contrary to the undeniable opportunity for review that section 78y affords Cochran, by definition postenforcement review does not exist for a party not facing an enforcement action.  As every circuit to consider the question (including this one in 2019) has recognized, that is the critical distinction between a case like this one and *Free Enterprise Fund.  See Bank of La. v. FDIC*, 919 F.3d 916, 926–27 (5th Cir. 2019); *Axon Enter.*, 986 F.3d at 1184; *Bennett*, 844 F.3d at 186; *Hill*, 825 F.3d at 1243; *Tilton*, 824 F.3d at 283–84; *Bebo*, 799 F.3d at 774–75; *Jarkesy*, 803 F.3d at 20.

*Free Enterprise Fund* involved an accounting firm that regulators were investigating but had not yet charged.  *Bank of La.*, 919 F.3d at 926 (discussing *Free Enter.*, 561 U.S. at 489–91).  The SEC judicial review provision does not provide an avenue for a party to challenge an investigation (as opposed to an actual enforcement proceeding).   *See* 15 U.S.C. §§ 78y, 7214(h)(2).  Consequently, the firm would have had to "incur a sanction" to get its constitutional claim before a court via the ordinary SEC review scheme.  *Bank of La.*, 919 F.3d at 926 (quoting *Free Enter.*, 561 U.S. at 490).  Having to

No. 19-10396

"bet the farm . . . by taking the violative action" is not a "'meaningful' avenue" for judicial review, so section 78y does not prevent the target of an investigation from suing in district court. *Free Enter.*, 561 U.S. at 490–91. But because Cochran is "already embroiled in an enforcement proceeding," she does "not have to 'bet the farm' to challenge agency action. The farm [is] already on the table." *Bank of La.*, 919 F.3d at 927.[11]

Our prior distinction between an investigation that may never reach an ALJ and a pending adjudication that already has is the same one other courts have recognized.[12]   *See Axon Enter.*, 986 F.3d at 1184; *Bennett,* 844

---

[11] The majority ignores this language we used just two years ago in a case that raised the same separation-of-powers claim about tenure protection that Cochran advances. *See Bank of La.*, 919 F.3d at 921, 930; *see also Matter of Bank of La.,* FDIC-12-489b, FDIC-12-479k, 2016 WL 9050999, at *13 (Nov. 15, 2016)). While not even acknowledging how *Bank of Louisiana* limits *Free Enterprise Fund* the way every other circuit has—to cases in which the plaintiff is not "embroiled in an enforcement proceeding," 919 F.3d at 927 (quotation omitted)—the majority declares that the decision was "addressing the explicit [FDIC statute] at issue." Maj. Op. 13. But *Bank of Louisiana*'s discussion of *Free Enterprise Fund* had nothing to do with the FDIC statute. *See* 919 F.3d at 926–27 (distinguishing *Free Enterprise Fund* without once mentioning the FDIC statute). What is more, *Bank of Louisiana* repeatedly relies on other circuits' rulings in SEC cases. *See id.* at 923–930 (quoting *Bennett*, 844 F.3d at 186–87; *Hill*, 825 F.3d at 1249–51; *Tilton*, 824 F.3d at 286–90; *Jarkesy*, 803 F.3d at 13–14, 16–17, 19, 22–23, 28–29; *Bebo*, 799 F.3d at 767, 773).

As the majority does not overrule *Bank of Louisiana*, the decision's holding about *Free Enterprise Fund* and the *Thunder Basin* factors apparently remain good law. That is because alternative holdings are binding precedent in our court. *United States v. Reyes-Contreras*, 910 F.3d 169, 179 n.19 (5th Cir. 2018) (en banc). The majority's failure to grapple with *Bank of Louisiana*'s application of the three *Thunder Basin* factors will cause confusion in future cases.

[12] Judge Oldham's opinion labels the difference between investigation and enforcement a "so-called" distinction. Concurring Op. 43. But it's a fundamental distinction to parties and lawyers involved in such matters. What is new is the majority's allowing district court intervention in an ongoing SEC enforcement action. Heretofore there was postenforcement review of agency decisions along with certain categories of truly pre-enforcement review. *See Abbott Labs. v. Gardner*, 387 U.S. 136 (1967). *Free Enterprise*

No. 19-10396

F.3d at 186; *Hill*, 825 F.3d at 1243; *Tilton*, 824 F.3d at 283–84; *Bebo*, 799 F.3d at 774–75; *Jarkesy*, 803 F.3d at 20. As the Ninth Circuit recently put it, "*Free Enterprise* does not appear to address a scenario where there is eventual judicial review, but rather speaks only to a situation of no guaranteed judicial review." *Axon Enter.*, 986 F.3d at 1184.[13]

In departing from the reading a unanimous Fifth Circuit panel gave *Free Enterprise Fund* just two years ago, the majority comes up with a distinction that no other circuit has recognized in the more than ten years since the Supreme Court decided *Free Enterprise Fund*. The distinction, the majority concludes, is that "the *Free Enterprise Fund* accounting firm sought structural relief." Maj. Op. 20–21. The most glaring problem with this theory is that nowhere does *Free Enterprise Fund* say that district court jurisdiction exists because the claim is a structural one.[14] *See* 561 U.S. at 490;

is of the latter category as the agency had not yet charged the plaintiff. Today's opinion creates a new category of midenforcement review.

[13] If all these decisions fly in the face of *Free Enterprise Fund* as the majority contends, then they would have been ripe for summary reversal at the Supreme Court. But thrice the Supreme Court denied cert petitions arguing that *Free Enterprise Fund* grants district courts' jurisdiction for separation-of-powers challenges to pending SEC proceedings. *Gibson v.* SEC, 141 S. Ct. 1125 (Jan. 11, 2021); *Tilton v.* SEC, 137 S. Ct. 2187 (May 30, 2017); *Bebo v. SEC*, 136 S. Ct. 1236 (Mar. 28, 2016).

The argument in those cert petitions will sound familiar. For example, one petition argues it is challenging a ruling "fundamentally incompatible with this Court's decision in *Free Enterprise Fund*." Petition for Certiorari, *Tilton v. SEC*, No. 16-906, 2017 WL 281861, at *12 (Jan. 18, 2017).

[14] Another problem is that it is difficult to delineate and discern when a claim is a "structural" one, and the majority makes no effort to do so. Consider the claim pending in our court that the Seventh Amendment requires a jury for securities fraud cases being decided in agency proceedings. Brief for Petitioners, *Jarkesy v. SEC*, No. 20-61007, at 7–34. Is that a structural claim? Maybe so, given that the jury right limits the power of other governmental actors. In some sense, though, every constitutional claim is about the separation of powers as a constitutional right is a limit on government. The categorical exception Cochran seeks thus may be neither a category nor an exception. The Supreme

*see also Axon Enter.*, 986 F.3d at 1184 ("But the Supreme Court in *Free Enterprise* did not carve out a broad exception for challenges to an agency's structure, procedure, or existence."). It would have been simple to make this distinction. One sentence would have done the trick: "We hold that because of the structural concerns raised by separation-of-powers claims, judicial review that follows an enforcement action does not provide meaningful review of them."

Instead of saying something along those lines, *Free Enterprise Fund* emphasizes that the investigative posture the accounting firm found itself in is what made section 78y inapplicable: "Section 78y provides only for judicial review of *Commission* action, and not every Board action is encapsulated in a final Commission order or rule." 561 U.S. at 490. The investigation by the Public Company Accounting Oversight Board (PCAOB) was not reviewable under section 78y because an investigation does not culminate in a final agency order. It follows easily from that fact that section 78y did not provide for meaningful review of the claim challenging the Board. *Id.*; *see also Axon Enter.*, 986 F.3d at 1184 ("[T]he court justified district court jurisdiction on the narrow ground that the challenged action—the Board's critical report of the auditing firm—did not amount to a final order that could be appealed to a court under the statutory scheme."). It also follows that section 78y provides a meaningful avenue of relief for people like Cochran and Lucia who are "embroiled in an enforcement proceeding" and can appeal an adverse agency order. *Bank of La.*, 919 F.3d at 927 (quotation omitted); *see also Lucia*,

---

Court noted similar line-drawing problems when it rejected carving out certain constitutional claims from a statute's channeling scheme because "a jurisdictional rule based on the nature of a[ ] . . . constitutional claim . . . is hazy at best and incoherent at worst." *Elgin*, 567 U.S. at 15; *cf. Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (noting that the concept of "structural error" in criminal cases should not carry "talismanic significance as a doctrinal matter").

138 S. Ct. at 2055–56 (vindicating a claim under the Appointments Clause raised via section 78y's review scheme).[15]

## B.

The investigation/enforcement distinction also explains why the *Free Enterprise Fund* claim was wholly collateral to the section 78y scheme whereas Cochran's removal power claim may not be. *See Jarkesy*, 803 F.3d at 23 (explaining that in *Free Enterprise Fund* "the Court found that the plaintiffs' pre-enforcement Article II claims were 'collateral' to the SEC administrative-review scheme because the *Free Enterprise* plaintiffs were not *in* that scheme at all; hence, their general challenge to the PCAOB's existence was 'collateral to any Commission orders or rules from which [judicial] review might be sought.'" (quoting *Free Enter.*, 561 U.S. at 490)). Courts analyzing whether a claim is wholly collateral to the administrative scheme have usually asked whether the plaintiff's claim arises as a result of the actions the agency took during the challenged proceedings. *Bank of La.*, 919 F.3d at 928–29. Cochran's challenge—that the official adjudicating her claim is unconstitutionally insulated from executive control—is "inextricably intertwined with the conduct of the very enforcement proceeding the statute grants the [SEC] the power to institute and resolve as an initial matter." *Id.* at 928 (quoting *Jarkesy*, 803 F.3d at 23). That is,

---

[15] The seemingly anomalous result that a party subject to the less onerous agency action of investigation may run to federal court while a party that has been charged must wait flows directly from the principle that federal court jurisdiction is a matter of statute. Because Congress set forth specific judicial review provisions for SEC proceedings, allowing recourse to the general grant of federal jurisdiction when there is a pending enforcement action would disrupt that scheme. *See Thunder Basin*, 510 U.S. at 207–09. There is no scheme for judicial review of SEC investigations, so falling back on general federal question jurisdiction does not undermine any contrary statutory path.

No. 19-10396

Cochran would not be able to assert this claim but for the SEC's charging her in an enforcement proceeding. *See Tilton*, 824 F.3d at 287–88 (explaining that because the plaintiff's constitutional claims was asserted "in response to" the SEC's commencement of administrative proceedings, it was at least "procedurally intertwined" such that "we cannot conclude that the claim is *wholly* collateral to the SEC's administrative scheme"). Unlike the *Free Enterprise Fund* claim then, Cochran's claim arises out of an SEC proceeding that is subject to the review scheme in section 78y. Other circuits have held that feature alone would be enough to conclude that Cochran's claim is not wholly collateral to the statutory review scheme. *Bennett*, 844 F.3d at 186–87; *Tilton*, 824 F.3d at 287–88; *Jarkesy*, 803 F.3d at 23-25.

The majority opinion takes a different approach to this factor, asking whether the substance of Cochran's claims is intertwined with the enforcement scheme. Although some circuits have suggested this approach, our court is the first to adopt it. *Bank of La.*, 919 F.3d at 928 (explaining that some circuit courts have suggested this approach though none have adopted it). And the majority's view echoes reasoning the Supreme Court has rejected. *See Elgin*, 567 U.S. at 29–30 (Alito, J., dissenting) ("Administrative agencies typically do not adjudicate facial constitutional challenges to the laws that they administer. Such challenges not only lie outside the realm of special agency expertise, but they are also wholly collateral to other types of claims that the agency is empowered to consider.").

But even the majority's preferred approach on "wholly collateral," cannot overcome the other two *Thunder Basin* factors to give the district court jurisdiction despite the statutory scheme of agency adjudication plus an appeal. *See Free Enter.*, 561 U.S. at 489–91 (holding that district court had jurisdiction because all three *Thunder Basin* factors favored that result); *Axon Enter.*, 986 F.3d at 1187 ("[U]nder Supreme Court precedent the presence of meaningful judicial review is enough to find that Congress precluded

89

No. 19-10396

district court jurisdiction . . . ."); *Bebo*, 799 F.3d at 774–75 (rejecting district court jurisdiction even after assuming the plaintiff's claims were "wholly collateral" to the scheme).[16]

## C.

The third *Thunder Basin* factor—agency expertise—appears at first blush to help Cochran. Purely legal questions that are not interpretations of the agency's statute or regulations—like issues of constitutional law—do not generally benefit from agency expertise. *See Thunder Basin*, 510 U.S. at 215; *see also Carr*, 141 S. Ct. at 1360 (excusing failure to exhaust in part because an ALJ does not have expertise on a separation-of-powers claim). But the Supreme Court's most recent instruction is that we should not just consider whether the agency has expertise with respect to the particular claim the plaintiff wants to resolve in district court. *See Elgin*, 567 U.S. at 23; *Tilton*, 824 F.3d at 289 (explaining that *Elgin* followed "a broader conception of agency expertise" in "emphasiz[ing] that an agency may bring its expertise to bear on a constitutional claim indirectly, by resolving accompanying, potentially dispositive issues in the same proceeding"); *Jarkesy*, 803 F.3d at 28 (explaining that *Elgin* "clarified . . . that an agency's relative level of insight into the *merits* of a constitutional question is not determinative" on the agency expertise factor).

The benefit of agency expertise should instead be assessed by looking at the overall case, so this factor accounts for the possibility that the agency's resolution of other issues "may obviate the need to address the constitutional

---

[16] Other circuits recognize that the "meaningful review" factor is paramount. *Hill*, 825 F.3d at 1245; *Tilton*, 824 F.3d at 282; *Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin.*, 376 F.3d 239, 243 (4th Cir. 2004). It is telling that, despite the primacy of the "meaningful review" factor, the majority relegates it to the end of its *Thunder Basin* discussion. Maj. Op. 20–21.

challenge." *Elgin*, 567 U.S. at 22–23; *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 n.11 (1980) ("[T]he possibility that Socal's challenge may be mooted in adjudication warrants the requirement that Socal pursue adjudication, not shortcut it."). The prospect that agency expertise could resolve an FDIC enforcement action in favor of the charged party is why we recently concluded that this *Thunder Basin* factor did not support exempting a separation-of-powers claim from the FDIC-review scheme Congress created. *Bank of La.*, 919 F.3d at 930 (citing *Jarkesy*, 803 F.3d at 28; *Hill*, 825 F.3d at 1250–51; *Tilton*, 824 F.3d at 289).

Considering whether a plaintiff might prevail before the ALJ on nonconstitutional grounds is consistent with the principle that we should avoid reaching difficult constitutional claims when alternative resolutions exist. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring). As Judge Sutton has explained, "*Elgin* and *Thunder Basin* promote" constitutional avoidance because "the crucible of administrative review ensures that the petitioner's case presents a true constitutional dispute before the Judiciary steps in to decide those weighty issues." *Jones Bros., Inc. v. Sec'y of Lab.*, 898 F.3d 669, 676 (6th Cir. 2018). Allowing separation-of-powers claims to evade the judicial review scheme that Congress created gets constitutional avoidance backward. *See Jarkesy*, 803 F.3d at 25.

The majority refuses to follow *Elgin* on this point. Its excuse for not doing so is that *Elgin*'s holding is supposedly inconsistent with *Free Enterprise Fund* and the latter controls because it involved the SEC. Maj. Op. 17 n.11, 20–21 & n.12. But there is no inconsistency. Once again, the fact that the *Free Enterprise Fund* accounting firm was not a party to an enforcement proceeding explains the different outcome. The firm was being investigated by a Board that it believed (correctly, it turned out) enjoyed unconstitutional removal protection. There was no ALJ to complain to about the

investigation.  There was no statutory defense that an ALJ could recognize to get the accounting firm out from under the investigation.  *Contrast Elgin*, 567 U.S. at 22–23 (explaining that a ruling by the agency on whether there was an "adverse employment action" might "avoid the need to reach [the] constitutional claims").  As a result, *Free Enterprise Fund* was not a case in which resolution of statutory claims the agency "routinely considers" "might fully dispose of the case."  *Id.* at 23.  In contrast, when there is a pending SEC administrative case, the ALJ's expertise in securities law may resolve the case and avoid the need to decide constitutional claims.  Cochran, for example, might show there was no accounting fraud.  This possible resolution of the enforcement proceeding on a ground in which the agency has expertise explains why other courts of appeals have been faithful to *Elgin* even in SEC cases.  *See Bennett,* 844 F.3d at 187; *Hill*, 825 F.3d at 1250–51; *Tilton*, 824 F.3d at 289; *Jarkesy*, 803 F.3d at 28; *Bebo,* 799 F.3d at 771.

\* \* \*

The *Thunder Basin* factors thus do not demonstrate that Congress intended to except separation-of-powers claims from the avenues the Exchange Act creates for challenging enforcement proceedings.  Just as Lucia followed those procedures to achieve a landmark ruling on the appointment power, Cochran has the same opportunity for her removal power claim.

No. 19-10396

### III.

Cochran contends that allowing immediate judicial resolution of her claim in district court would be the more efficient course. But that is a myopic view as it assumes the arguments an SEC respondent advances in the district court will always be winning ones. What if claims brought in district court fail on the merits? Then, instead of the one court Congress authorized, three courts would have devoted time to the agency matter: (1) the district court pre-enforcement; (2) the court of appeals in its review of the pre-enforcement challenge, and (3) another court of appeals panel in the traditional postenforcement review. *Cf. Standard Oil*, 449 U.S. at 242 (recognizing that "piecemeal review" prior to the completion of adjudication "is inefficient and upon completion of the agency process might prove to have been unnecessary"). On top of that, a respondent will get two bites at a cert. petition—one pre-enforcement and one post. Multiple layers of unsuccessful pre-enforcement judicial review will be costly to the parties and courts while substantially delaying the agency proceeding. Also problematic is that allowing judicial review both before and after an agency adjudication risks review of the same matter in different circuits, a result that would be inefficient, anomalous, and potentially mischievous. *Cf. Elgin*, 567 U.S. at 14 (recognizing that allowing district court jurisdiction over challenges to agency proceedings creates the "potential for inconsistent decisionmaking and duplicative judicial review"); *see also Jarkesy*, 803 F.3d at 30.

Even when the pre-enforcement suit succeeds, allowing multiple layers of review before the agency rules may not necessarily be more efficient. It is not certain that district court litigation, followed by appellate review, would produce a quicker resolution than agency adjudication followed by appellate review. Review schemes that exclude district courts, like those in section 78y, recognize that a "double layer of judicial review" can be

"wasteful and irrational." *See Elgin*, 567 U.S. at 14 (quoting *United States v. Fausto*, 484 U.S. 439, 445 (1988)).

The point, though, is that regardless of whether efficiency concerns tilt in favor of pre-enforcement review in a particular case, systemic concerns about piecemeal review in the mine run of cases counsels against adding layers of review to the scheme the Exchange Act created. *See, e.g., Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981) (listing reasons that "a party must ordinarily raise all claims of error in a single appeal following final judgment on the merits"). Postenforcement review schemes in administrative law are hardly the only situation in the law when parties have to wait for review of claims that might end their dispute. For example, the general prohibition on interlocutory appeals requires a party to litigate its whole case before challenging on appeal a constitutionally deficient trial. In criminal cases, that means a defendant may spend months (if not years) in prison before an appellate court recognizes that he should not have faced the prosecution in the first place. *See Jarkesy*, 803 F.3d at 26 ("[W]hen a district court denies a federal criminal defendant's pretrial motion, that denial ordinarily is not immediately appealable."). And abstention doctrines often prevent parties from seeking immediate vindication of constitutional rights in federal court. *Id*. at 26 (citing *Younger v. Harris*, 401 U.S. 37, 46 (1971)). Such rules against premature judicial intervention recognize that piecemeal review will often prove less efficient. *See Cobbledick v. United States*, 309 U.S. 323, 325 (1940) (explaining that the final judgment rule "avoid[s] the obstruction of just claims that would come from permitting the harassment and cost of a succession of separate appeals").

At the end of the day, however, which system of review is more efficient is beside the point. Congress and the President get to make that policy decision when they enact laws. As every other circuit to consider this question has held, even when it comes to separation-of-powers claims, the

No. 19-10396

Exchange Act allows judicial involvement only after the end of an SEC proceeding.

\* \* \*

This case presents a technical but important jurisdictional issue. It is not a referendum on the Presidencies of Woodrow Wilson and Franklin Roosevelt. *But see* Concurring Op. 30–43.

In sticking to our judicial duty of answering the legal question before us, we take Supreme Court precedent as it is, not as we wish it to be. All five courts of appeals that have applied that caselaw have concluded it compels the same result the district court reached in this case: section 78y creates an exclusive review scheme for pending SEC proceedings that does not allow district court intervention. Today's novel ruling to the contrary is at odds with *Elgin* and *Thunder Basin*, overrides the Exchange Act's exclusive review scheme, will be inefficient for courts and agencies, and injects federal courts into sensitive interbranch disputes before seeing if there are other ways to resolve a case.